## THE IRRAWADDY.[1]

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 591. Submitted April 11, 1898. — Decided May 31, 1898.

If a vessel, seaworthy at the beginning of the voyage, is afterwards stranded by the negligence of her master, the ship owner, who has exercised due diligence to make his vessel in all respects seaworthy, properly manned, equipped and supplied, under the provisions of § 3 of the act of February 13, 1893, c. 105, 27 Stat. 495, has not a right to general average contribution for sacrifices made and suffered by him subsequent to the stranding, in successful efforts to save vessel, freight and cargo.

The main purposes of the act of February 13, 1893, known as the Harter Act, were to relieve the ship owner from liability for latent defects, not discoverable by the utmost care and diligence, and, in the event that he has exercised due diligence to make his vessel seaworthy, to exempt him and the ship from responsibility for damages or loss resulting from faults or errors in navigation or in the management of the vessel; but the court cannot say that it was the intention of the act to allow the owner to share in the benefits of a general average contribution to meet losses occasioned by faults in the navigation and management of the ship.

In determining the effect of this statute in restricting the operation of general and well-settled principles, the court treats those principles as still existing, and limits the relief from their operation afforded by the statute to that called for by the language of the statute.

---

[1] The docket title of this case is *Flint, Eddy & Company, Appellants*, v. *George Chrystall and James Greig, as Trustees.*

THIS case comes here on a certificate from the United States Circuit Court of Appeals for the Second Circuit.

The facts out of which the question arise are as follows:

On November 9, 1895, the British steamship Irrawaddy, upon a voyage from Trinidad to New York, with cargo, stranded on the coast of New Jersey through the negligent navigation of her master. Up to the time of stranding she was properly manned, equipped and supplied, and was seaworthy.

The vessel was relieved from the strand November 20 as the result of sacrifices by jettison of a portion of her cargo, of sacrifices and losses voluntarily made or incurred by the ship owners through the master and of the services of salvors.

The Irrawaddy then completed her voyage and made delivery of the remainder of her cargo to the consignees in New York on their executing an average bond for the payment of losses and expenses which should appear to be due from them, provided they were stated and apportioned by the adjusters "in accordance with established usages and laws in similar cases."

An adjustment was afterwards made in New York, which allowed in the general average account the compensation of the salvors, the sacrifices of cargo and the losses and sacrifices of the ship owner.

The respondent thereupon paid $4483.64, which was their full assessment, except the sum of $508.29 charged against them in respect of sacrifices of the ship owner, which they refused to pay.

The District Court made a decree in favor of the libellants; from which decree the respondent duly appealed to this court.

· Upon these facts the court desires instruction upon the following question of law, namely:

If a vessel, seaworthy at the beginning of the voyage, is afterwards stranded by the negligence of her master, has the ship owner, who has exercised due diligence to make his vessel in all respects seaworthy, properly manned, equipped and supplied, under the provisions of section 3 of the act of February 13, 1895, a right to general average contribution for

sacrifices made and suffered by him subsequent to the stranding, in successful efforts to save vessel, freight and cargo?

*Mr. Wilhelmus Mynderse* and *Mr. James C. Carter* for appellants.

*Mr. Harrington Putnam* for appellees.

MR. JUSTICE SHIRAS, after stating the case, delivered the opinion of the court.

The answer we shall give to the question certified by the Circuit Court of Appeals must be determined by the meaning and effect which should be given to the act of February 13, 1893, c. 105, 27 Stat. 445, known as the Harter Act. Admittedly, upon the facts conceded to exist in the present case, the owner of the ship has no right to a general average contribution from the cargo, unless such right arises from the operation of that act.

We shall first inquire why it is that, apart from the act in question, the owner of the ship is not entitled to a general average contribution where the loss was occasioned by the fault of the master or crew, and we find the rule is founded on the principle that no one can make a claim for general average contribution, if the danger, to avert which the sacrifice was made, has arisen from the fault of the claimant or of some one for whose acts the claimant has made himself, or is made by law responsible to the co-contributors. We are not called upon either to trace the history of the rule, or to justify it as based on equitable principles, as it is conceded on both sides that such is the ordinary rule in the absence of statute or contract to modify it.

Nor is it necessary to inquire into the origin or nature of the law of general average. That has been so recently and thoroughly done in *Ralli* v. *Troop*, 157 U. S. 386, that it is sufficient to refer to the opinion of Mr. Justice Gray in that case.

Not only is the ship owner excluded from contribution by

way of general average when the loss arises from the ship's fault, but he is legally responsible to the owner of the cargo for loss and damages so occasioned. And it is the well-settled law of this court that a common carrier by sea cannot, by any stipulation with a shipper of goods, exempt himself from responsibility for loss or damage arising from the negligence of the officers or crew; that it is against the policy of the law to allow stipulations that will relieve a carrier from liability for losses caused by the negligence of himself or his servants. *Liverpool Steam Co.* v. *Phœnix Ins. Co.*, 129 U. S. 397.

Further, it has frequently been decided by this court that in every contract for the carriage of goods by sea, unless otherwise expressly stipulated, there is a warranty on the part of the ship owner that the ship is seaworthy at the time of beginning her voyage, and not merely that he does not know her to be unseaworthy at the time of beginning her voyage, or that he has used his best efforts to make her seaworthy; and that his undertaking is not discharged because the want of fitness is the result of latent defects. *Richelieu Navigation Co.* v. *Boston Insurance Co.*, 136 U. S. 408; *The E. J. Morrison*, 153 U. S. 199; *The Caledonia*, 157 U. S. 124.

In this condition of the law the so called Harter Act was approved on February 13, 1893, wherein, after providing in the first and second sections that it shall not be lawful for any owner, agent or master of any vessel transporting merchandise or property from or between ports of the United States and foreign ports, to exempt himself from liability for loss or damage arising from negligence in the loading or proper delivery of such property, or to insert in any bill of lading any covenant or agreement whereby the obligations of the owner to exercise due diligence in manning and equipping the vessel, and to make such vessel seaworthy and capable of performing her intended voyage should be in anywise lessened, weakened or avoided, it was, in the third section, enacted as follows:

"That if the owner of any vessel transporting merchandise or property to or from any port in the United States of America shall exercise due diligence to make the said vessel

in all respects seaworthy and properly manned, equipped and supplied, neither the vessel, her owner or owners, agents or charterers, shall become or be held responsible for damage or loss resulting from faults or errors in navigation or in the management of said vessel, nor shall the vessel, her owner or owners, charterers, agent or master, be held liable for losses arising from the danger of the sea or other navigable waters, acts of God or public enemies, or the inherent defect, quality or vice of the thing carried, or from insufficiency of package, or seizure under legal process, or for loss resulting from any act or omission of the shipper or owner of the goods, his agent or representative, or from saving or attempting to save life or property at sea, or from any deviation in rendering such service."

The argument on behalf of the ship owner is clearly expressed by the learned judge of the District Court in the following terms:

"There is no doubt, I think, that the liability to indemnify the cargo owner is the sole ground of the exclusion of the ship owner's claim to general average compensation for his expenses in rescuing the adventure from a peril caused by bad navigation. It therefore seems necessarily to follow that in cases where all such liability is abolished by law, as it is under the circumstances of this case by the Harter Act, no such exclusion can be justified; and that where no such liability exists on the part of the ship or her owner, his right to a general average contribution from the cargo arises necessarily by the same principles of equitable right that apply in ordinary cases of general average. Where due diligence has been exercised to make the ship seaworthy, and a common danger arises upon the voyage by 'fault or error in the navigation or management of the ship,' the third section of that act declares that 'neither the vessel nor her owner, agent or charterer shall become or be held responsible for damage or loss resulting therefrom;' the previous liability of the ship owner to the cargo owner for faults of navigation is thus abolished in all cases coming within the act. In such cases faults in the navigation or management of the ship are no longer, by construc-

tion of law, faults of the owner, as heretofore; and the ship and her owner are now no more liable to the cargo owner for his damages therefrom than the latter is liable to the ship owner for the resulting damages to the ship. Both are alike strangers to the fault, and equally free from all responsibility for it ; and hence all expenditures or losses voluntarily incurred for the common rescue are no longer made in the discharge of an individual legal obligation, or in diminution of a fixed liability resting upon one of the parties only, but are truly a sacrifice, voluntarily incurred, and for the common benefit, as much and as truly so when made by the ship owner as when made by the cargo owner alone. On principle, therefore, in such cases, the one is as much entitled to a general average contribution for his sacrifice as the other." "The application of this new relation of non-responsibility under the Harter Act to cases of general average does not, in fact, make the least change in the principles of general average contribution. The rule remains as before, that he by whose fault, actual or constructive, the ship and cargo have been brought into danger cannot recover an average contribution for his expenses in extricating them. And so the counter rule remains as before, that the interest which, being without fault, makes sacrifices for the common rescue, is entitled to an average contribution from what is thereby saved. Prior to the Harter Act the ship owner, under our law, was constructively in fault for bad navigation and hence fell within the former rule. The Harter Act, by abolishing his constructive fault and freeing him from all responsibility, withdraws him from the former rule and entitles him to contribution under the latter." (82 Fed. Rep. 472, 474–477.)

We are unable to accept this view of the operation of the act of Congress.

Plainly the main purposes of the act were to relieve the ship owner from liability for latent defects, not discoverable by the utmost care and diligence, and, in event that he has exercised due diligence to make his vessel seaworthy, to exempt him and the ship from responsibility for damage or loss resulting from faults or errors in navigation or in the

management of the vessel. But can we go further, and say that it was the intention of the act to allow the owner to share in the benefits of a general average contribution to meet losses occasioned by faults in the navigation and management of the ship?

Doubtless, as the law stood before the passage of the act, the owner could not contract against his liability and that of his vessel for loss occasioned by negligence or fault in the officers and crew, because such a contract was held by the Federal courts to be contrary to public policy, and, in this particular, the owners of American vessels were at a disadvantage as compared with the owners of foreign vessels, who can contract with shippers against any liability for negligence or fault on the part of the officers and crew. This inequality, of course, operated unfavorably on the American ship owner, and Congress thought fit to remove the disadvantage, not by declaring that it should be competent for the owners of vessels to exempt themselves from liability for the faults of the master and crew by stipulations to that effect contained in bills of lading, but by enacting that, if the owners exercised due diligence in making their ships seaworthy and in duly manning and equipping them, there should be no liability for the navigation and management of the ships, however faulty.

Although the foundation of the rule that forbade ship owners to contract for exemption from liability for negligence in their agents and employés, was in the decisions of the courts that such contracts were against public policy, it was nevertheless competent for Congress to make a change in the standard of duty, and it is plainly the duty of the courts to conform in their decisions to the policy so declared.

But we think that for the courts to declare, as a consequence of this legislation, that the ship owner is not only relieved from liability for the negligence of his servants, but is entitled to share in a general average rendered necessary by that negligence, would be in the nature of a legislative act. The act in question does, undoubtedly, modify the public policy as previously declared by the courts, but if Congress had intended to grant the further privilege now contended for it

would have expressed such an intention in unmistakable terms. It is one thing to exonerate the ship and its owner from liability for the negligence of those who manage the vessel; it is another thing to authorize the ship owner to do what he could not do before, namely, share in the general average occasioned by the mismanagement of the master and crew.

What was the reasoning on which the courts proceeded in holding that it was against public policy to permit ship owners to contract for exemption from liability for the negligence of their agents? Was it not that such a state of the law would impel the ship owners to exercise care in the selection of those for whose conduct they were to be responsible? This being so, can it be reasonably inferred that Congress intended, when relieving ship owners from liability for the misconduct of their agents, to confer upon them the further right to participate in a general average contribution, and that to the detriment of the shippers? Such an interpretation of the statute would tend to relieve ship owners, to some extent at least, from care in the selection of the master and crew; and it would likewise operate to influence the master in deciding, in an emergency, whether he would make a case of general average by sacrificing the vessel, in whole or in part. If he knew that the owner would participate in a contribution occasioned by a loss, he would be the less likely to exert himself and crew to avoid the loss.

It is said that it has been decided by the English courts that when, by a contract in the bill of lading, the ship owner is exonerated from liability for loss caused by the fault of the master or crew, he is entitled to share in a general average contribution.

An examination of the cases cited has not convinced us that there has been any such final decision by the English courts. The case of *The Carron Park*, 15 P. D. 203, does, indeed, hold that the relation of the goods owner to the ship owner was altered by the contract; that the ship owner was not to be responsible for the negligence of his servants in the events which have happened; and that, therefore, the ship owner's claim for general average was allowed. On the other hand,

in the case of *The Ettrick,* 6 P. D. 127, where the ship owner claimed the benefit of a general average contribution rendered necessary by reason of negligence in navigation, and put his claim on the ground that, having availed himself of the limited liability laws by paying into court the £8 a ton, which is the limitation fixed by the statutes of Great Britain, he was thereby relieved from his liability on account of the negligence in the navigation, and stood in the position of an innocent party entitled to share in the contribution. But the Court of Appeals held otherwise, and Sir George Jessel, M. R., said :

" The ground upon which the ship owner puts his claim is this : he says that the payment of £8 per ton not only prevents his being answerable in damages for any more, but is equivalent to saying that he shall be in exactly the same position as if no negligence had been committed, and nothing had been done by him or his agents that would give rise to any liability. But I cannot read the act so. All it says is that he shall not be answerable in damages for any greater amount. It does not make his acts right if they were previously wrongful. It does not give him any new rights as far as I can see. . . . It seems to me that he could have no such right, for the statute does not destroy the effect of all that had been done, as it simply diminishes or limits the liability in damages. If that is so, of course there is an end of the case."

But whatever may be the English rulings as to the effect of contract immunity from negligence as entitling the ship owner to claim in general average, we do not think the cases are parallel. By the English law the parties are left free to contract with each other, and each party can define his rights and limit his liability as he may think fit. Very different is the case where a statute prescribes the extent of liability and exemption.

Upon the whole, we think that in determining the effect of this statute in restricting the operation of general and well-settled principles, our proper course is to treat those principles as still existing, and to limit the relief from their operation

afforded by the statute to that called for by the language itself of the statute.

*Our conclusion accordingly is, that the question certified to us by the Court of Appeals should be answered in the negative, and it is so ordered.*

MR. JUSTICE BROWN, with whom was MR. JUSTICE McKENNA, dissenting.

I am constrained to dissent from the opinion of the court in this case. While I freely concede that the owner of a ship is not by the general maritime law entitled to a general average contribution, where the loss is occasioned by the fault of the master or crew, I regard the third section of the Harter Act as introducing a new feature into the law of carriage by sea, and as eliminating altogether the question of negligence in navigation. This section provides in substance that if the owner shall exercise due diligence to make his vessel in all respects seaworthy, and properly manned, equipped and supplied, he shall not " be held responsible for damage or loss resulting from faults or errors in navigation or in the management" of his vessel.

As the steamer Irrawaddy was stranded on the coast of New Jersey, confessedly by the negligent navigation of her master, it will not be contended that she or her owners became liable to the owners of the cargo for any damages thereby occasioned. It is said, however, that while the Harter Act may be appealed to in defence of any action by the cargo against the ship, it is not available by the ship owner in a suit against the owners of the cargo for a contribution to the general average expenses occasioned by such stranding. If this be so, then the ship is thereby made responsible for a fault in her navigation to the exact extent to which she would be otherwise entitled to a general average contribution, and the statute to that extent is disregarded and nullified. I consider this a narrow and technical construction of the act. I think the third section makes the question of fault in navigation an immaterial one, and eliminates it from

the relations of the ship to the cargo. The section, therefore, becomes available to the ship owner either as a weapon of defence or attack. If the ship owner stands in relation to the cargo as if no fault had been committed, it is impossible for me to see why he may not avail himself of this in whatever shape the question may arise.

As the Harter Act is a novelty in maritime legislation, of course it would be vain to search for authorities based upon a similar enactment; but cases are by no means wanting where a similar question has arisen upon stipulations in bills of lading exempting the owner of the ship from the consequences of faults or errors in navigation. While it is conceded in this country that such stipulations are of no avail, it is equally well settled that by the law of England, and of some, if not all, of the maritime nations of continental Europe, they are held to be valid and binding.

In the case of *The Carron Park*, 15 P. D. 203, a charter party contained a stipulation that the ship owners were not to be responsible " for any act, negligence or default whatsoever of their servants during the said voyage." The cargo having been damaged by water pouring through a valve, negligently left open by one of the engineers, the owners brought suit against the vessel, and the owners of the ship counterclaimed for a general average contribution. It was held by the Admiralty Division that the ship was exonerated in the suit against her by the owners of the cargo, and was also entitled to her contribution. In delivering the opinion, Sir James Hannen, President, observed : " The claim for contribution as general average cannot be maintained where it arises out of any negligence for which the ship owner is responsible; but negligence for which he is not responsible is as foreign to him as to the person who has suffered by it. The loss would not have fallen upon the ship owner, and the expenditure or sacrifice made by him is not made to avert loss from himself alone, but from the cargo owner." The case of *Strang* v. *Scott*, 14 App. Cas. 601, was cited to the proposition that the conditions ordinarily existing between parties standing in the relation of ship and cargo owners may be varied by special contract.

It is true that the case of *The Carron Park* was not one arising upon a statute but upon a stipulation in a charter party; but I think it can make no possible difference in the legal aspect of the case whether the exemption be conceded by contract or granted by statute.

The case of *The Ettrick*, 6 P. D. 127, is not in point. In that case the owner of a ship, sunk by a collision in the Thames, admitted the collision to be his fault, and paid into court eight pounds a ton in a suit to his liability. The ship having been subsequently raised at the expense of the owner, he sought to recover in general average against the cargo its contributory portion of such expenses. It was held that this could not be done, the court basing its opinion upon the language of the Merchants' Shipping Act, section 54, which merely declared that the owners of the ship should not be *answerable for damages* in respect of losses to ships or goods to a greater amount than eight pounds per ton of the ship's tonnage. In delivering the opinion of the court, Sir George Jessel observed: "That is merely the limit of the liability for damages. It does not in any way alter the property. . . . Now, property not being altered, the ground upon which the ship owner puts his claim is this: He says that the payment of eight pounds per ton not only prevents his being answerable in damages for any more, but is equivalent to saying that he shall be in exactly the same position as if no negligence had been committed, and nothing had been done by him or by his agents that would give rise to any liability. But I cannot read the act so. All that it says is, that he shall not be answerable in damages for any greater amount. It does not make his acts right if they were previously wrongful. . . . It seems to me that he would have no such right," (that is, to salvage on the cargo,) "for the statute does not destroy the effect of all that had been done, as it simply diminishes or limits the liability in damages. If that is so, of course that is an end of the case."

In the case of *The Carron Park* the stipulation exempted the ship from the consequences of all negligence in her navigation. In *The Ettrick* the act simply limited the liability of

the owner in damages to a certain sum per ton: The operation of the Merchants' Shipping Act was evidently intended to be merely defensive. *The Ettrick*, though cited by counsel, was not referred to by the court in *The Curron Park*, and was evidently regarded as standing upon a different footing.

The French law in this particular is the same: The case of *Le Normand* v. *Compagnie Générale Transatlantique*, 1 Dalloz, Jurisprudence Générale, 479, before the French Court of Cassation, was an appeal from the court of Rouen, which had treated as general average the expenses of salvage and towage of the steamer Amérique, after having found that the abandonment of the ship was imputable only to the master and crew, and had held that a contract exempting the ship from the consequences of negligence, permitted the owners of the ship to recover from the owners of the cargo their share in contribution of the expenses of salvage. In the opinion of the Court of Cassation upon appeal it was said that in this bill of lading the defendant company, the owner of the Amérique, had formally excepted the acts of God, of enemies, pirates, fire by land or sea, accidents proceeding from the engine, boilers, steam and all other accidents of the sea caused or not caused by the negligence, fault or error of the captain, crew or engineers, of whatever nature these accidents were, or whatever were their consequences. It was further said that no law forbade the owners of ships from stipulating that they would not answer for the faults of the captain or crew; that such an agreement is no more contrary to public policy than to fair dealing; that in upholding this clause in the bill of lading by which the defendant company declined responsibility for the faults of the crew, the decree appealed from violated no law. It was thereby established that the ship had been abandoned at sea, after consultation with the crew; that it had afterwards been picked up by three English vessels, which had towed it to Plymouth, where it was voluntarily stranded, and that the defendant company had reclaimed it from the salvors by paying the expenses of salvage and towage; and thereupon the court held that this was a damage voluntarily suffered, that the expenses were incurred

for the common safety of the ship and cargo, and without the payment of which the salvors would not have been obliged to deliver over the vessel, and that such expenses constituted a claim for general average, notwithstanding the abandonment of the ship was not attributed to a peril of the sea, but to the fault of the master and crew.    The decree was affirmed.

The case of *Crowley* v. *Saint Frères*, 10 Revue Internationale du Droit Maritime, 147, also came before the French Court of Cassation in 1894.    In this case, an English ship, the Alexander Lawrence, on a voyage from Calcutta to Boulogne, with a cargo of jute, took fire through the carelessness of a sailor. The ship put into Port Louis, an immediate port, with the cargo still burning, and extinguished it, subsequently arriving at her port of destination.    By a clause in the charter party the ship was exonerated from responsibility for negligence. It was held that the expenses of putting into the port of refuge should be classed as general average, and not as particular average, as it had been held by the court below.    The decree of that court (of Douai) was therefore reversed.

A case arising from the same disaster to the Alexander Lawrence, between the owners and the underwriters, 11 Revue Internationale, 41, subsequently came before the Court of Appeal of Orleans, on appeal from the Tribunal of Commerce of Boulogne, where a similar ruling was made, and the expenses of putting into port classed as general average under the stipulation in the charter party, although in the absence of such stipulation they would have been chargeable to the ship.

The same question came before the Tribunal of Commerce of Antwerp, Belgium, in the case of *The Steamer Alacrity*, 11 Revue Internationale, 123, where the cargo was held to contribute to the expenses of putting into a port of refuge, in consequence of a collision due to the fault of the captain, the ship owner being exonerated by his contract from the consequences of this fault.    In this case the parties had stipulated that general average expenses should be payable under the York-Antwerp rules, and that the ship should not be responsible for the faults of the captain or crew.    It was

held that, by the Belgium law, parties might contract with reference to these rules, which declared the expenses of putting into a port of refuge general average; that there was no difference between such expenses when occasioned by an inevitable accident or in consequence of the fault of the captain; that the parties having stipulated that the ship should be exonerated from the consequences of such fault, the owners of the cargo were bound for their contributory shares.

From the case of *The Mary Thomas*, P. D. 1894, p. 108, it would seem that the Dutch law is different; but it was said by Mr. Justice Barnes in this case (p. 116) that if the question had arisen in this country (England) "the point could hardly have occurred, as it has done, because it has already been decided by Lord Hannen, in the case of *The Carron Park*, that the cargo owners would be liable for the contribution in general average under circumstances where the accident has occurred through negligence, but where by the bills of lading the owners of the ship were not responsible for that negligence."

These are all the cases I have been able to find directly upon the question under consideration, but there is a class of analogous cases which, I think, have a strong bearing in the same direction. It is well known that by the law of England a ship is not responsible to another for a collision brought about by the negligence of a compulsory pilot. Of course where such ship is solely to blame the rule is easy of application. No recovery can be had against her. But where the faults of the two vessels are mutual, a different question arises; and in the case of *The Hector*, 8 P. D. 218, it was held that, where a collision occurred by the mutual fault of two vessels, and one of such vessels had on board a compulsory pilot, whose fault contributed to the accident, the owner of that vessel was entitled to recover a moiety of the damages sustained by her without any deduction on account of the damage sustained by the other; in other words, she was not responsible for any portion of the damage done to the other vessel, but might recover the half of her damages from such other vessel. Said the Master of the Rolls in delivering the opinion:

" With regard to the Augustus, she was found to blame for the collision, therefore she is, in the first instance, liable to pay all the damage which the Hector has suffered. With regard to the Hector, it is found that her owners are not to blame, but that her navigation was to blame; but that was the fault of the pilot. The owners are not liable for this default, therefore they are not liable for anything to the owners of the Augustus. What is the result? That the liability of the owners of the Augustus is declared to have been proved, but the liability of the owners of the Hector is disproved, and they are dismissed from the suit. Therefore no balance is to be calculated; the owners of the Hector are not liable for a single pennyworth of the damage done to the Augustus. The owners of the Augustus must go against the pilot and get what they can out of him; but the Hector is entitled to succeed."

See also *Dudman* v. *Dublin Port and Docks Board*, Irish Rep. 7 C. L. 518; *Spaight* v. *Tedcastle*, 6 App. Cas. 217.

It seems to me that the cases above cited show an almost uniform trend of opinion against the principle laid down by the court in this case. I do not contend that the decisions of the English, French and Belgian courts should be recognized by us any further than their course of reasoning commends itself to our sense of justice; but upon questions of maritime law, which is but a branch of international law, I think the opinions of the learned and experienced judges of these courts are entitled to something more than respectful consideration. It is for the interest of merchants and ship owners, whose relations and dealings are international in their character, that the same construction should, so far as possible, be placed upon the law maritime by the courts of all maritime nations, and I am compelled to say that I see no reason for creating an exception in this case.