### TARABOCHIA v. AMERICAN SUGAR REFINING CO.

(District Court, E. D. Pennsylvania. February 23, 1905.)

#### No. 65.

SHIPPING—GENERAL AVERAGE—LOSS THROUGH NEGLIGENT NAVIGATION.

A steamship laden with sugar left the port of Samarang, Java, at night, and about 5 in the morning ran upon the Korea reef, a small unmarked, but charted, coral rock lying under the water; and in order to float her it became necessary to jettison a part of the coal and cargo. The course of the vessel was laid by the master, and was to be changed after she had proceeded a certain distance, which would have taken her to the southward of the reef four miles, which distance should have been increased by the prevailing current, the weather being calm. At the time the change of course was made in the night, the navigation of the vessel was in charge of the first mate. Neither his testimony nor that of the engineer was taken, and there was no direct evidence as to the time or distance from port when the change was made. *Held*, that on such state of the evidence the probability was that the accident occurred through the error or negligence of the mate in overrunning the course, and that the vessel was not entitled to a general average contribution from the cargo owner.

[Ed. Note.—General average, see note to Pacific Mail Steamship Co. v. New York, H. & R. Min. Co., 20 C. C. A. 357.]

In Admiralty. Suit to recover a general average contribution from cargo owner.

Henry R. Edmunds, for libelant.
Harrington Putman and Biddle & Ward, for respondent.

J. B. McPHERSON, District Judge.  This action is brought to recover from the owner of cargo its proper contribution toward a general average loss sustained in June, 1900, during a voyage from Java to the Delaware Breakwater.  The libelant is master of the steamship Adriatico, an Austro-Hungarian vessel, which was chartered in April, 1900, to carry a cargo of sugar from certain ports on the north coast of Java to the Delaware Breakwater, this being one of the possible points of destination in Europe and America that were named in the charter party.  On June 24 she finished loading at the port of Samarang, and began her voyage to this country in calm and clear weather about half past 11 in the night of that day.  She was drawing 22 feet 8 inches forward and 24 feet aft, and, at a quarter to 5 in the morning of June 25, when she had proceeded about 30 miles on her way, she ran upon the Bapang, or Korea, reef, which is a small, unmarked coral rock about 13 yards in circumference, hidden under 14 feet of water.  There is plenty of depth all around it.  Immediate efforts were made to get the ship off by reversing the engines, and afterwards by the use of a hawser and other lines, an anchor and the steam winch, and by filling a tank at the stern in order to raise the bow.  The vessel could not be moved, however, and, as speedy assistance could not be obtained, and the ship was in a dangerous position if bad weather should come on 100 tons of coal were jettisoned, and afterwards 100 baskets of sugar, a part of the cargo.  Another effort that day to relieve the vessel was also ineffective, but about 8 o'clock in the morning of the 26th she was finally pulled off the rock, losing the anchor and lines and sustaining other damage, which aggregated a considerable amount, and forms the basis of the present claim.  The loss was adjusted after the vessel arrived in America, and I do not understand the accuracy of the computation to be in dispute.  The controversy has to do wholly with the question of the ship's negligence, the respondent denying liability in toto on the ground that the stranding was due to negligent navigation, and that the loss is therefore not the subject of general average.

It is undoubtedly true, as was decided in The Irrawaddy, 171 U. S. 189, 18 Sup. Ct. 832, 43 L. Ed. 131, that "the owner of a ship is not entitled to a general average contribution where the loss was occasioned by the fault of the master or crew."  And the rule is declared to be "founded on the principle that no one can make a claim for general average contribution if the danger, to avert which the sacrifice was made, has arisen from the fault of the claimant, or of some one for whose acts the claimant has made himself, or is made by law, responsible to the co-contributors."  It is necessary, therefore, to inquire whether the master or some other officer of the ship was negligent in directing the navigation, and thus caused the stranding and the losses that are complained of.  The vessel was of steel, only a few months old, of nearly 2,600 tons net register, was properly manned, equipped, and supplied when she left Samarang, and was then in a thoroughly seaworthy condition.  The master was a man of 43 years' experience at sea, 27 years in command of sailing vessels and 10 years in command of steamships, and had been in these waters twice before, although this was his first voyage to the island of Java.  I see no reason to doubt

his testimony that "before leaving Samarang I made, as usual in all my voyages, a study of the course to be taken, and of the winds, currents, banks, rocks, etc., in order to make the voyage successfully, and protect the lives and property confided to me." That he was a careful and competent commander is evidenced by the fact that this was the first time a vessel in his hands had ever been stranded. He was in charge of the ship when she started, and gave orders that her course should be laid northwest until the taffrail log, which was thrown overboard very soon after the voyage began, should register nine miles, after which the course was to be changed to west-northwest. The first course was intended to pass about three miles to the northward of Korowelany rock, and the second course to pass four miles to the southward of Korea reef. These rocks are well known, appeared on the chart that was examined by the officers of the ship, and the master and both mates knew where they were. It has been argued that the course referred to brought the vessel imprudently near to Korea reef, and that a margin of at least 10 miles should have been aimed at, so as to provide against all contingencies, there being plenty of sea room both north and south of the reef. I am not prepared to say, however, that there was negligence in adopting the course described. The compasses were correct (so the master testified), the sea was calm, the wind was not strong enough to be an element of danger, and the slight current which exists in these waters sets toward the shore, and, as the master testified, "should have helped to keep us still further away from [the reef]." It clearly appears, as it seems to me, that, if the course laid down by the master had been exactly, or even approximately, run, the vessel would not have encountered the rock. And this brings me to what I cannot help regarding as the fatally weak point in the libelant's case, namely, the total absence of testimony concerning the hour and the distance run when the course was changed. The master went below at half past 12, leaving the ship in charge of the first mate, whose watch lasted until 4 o'clock, when the second mate relieved him. The change of course was made by the first mate, but neither his testimony nor the testimony of the man at the wheel has been taken, and no direct information is offered upon the vital question of the time when, and the place where, the direction of the ship was changed. The second mate testified to certain declarations made to him by the first mate upon this subject at 4 o'clock, but this is merely hearsay, and cannot be allowed to have any weight. In addition to the usual objections against hearsay evidence, there is a special danger here; for, if the first mate had been negligent, and had overrun the point where the course should have been changed, he would be under a strong temptation to conceal his fault. Neither was the engineer examined, although the exact speed of the ship during these hours was a most important factor in the problem; and neither the master nor the second mate could throw any further light upon the question than by testifying to the vessel's customary speed. But how fast she was actually going between midnight and 4 o'clock has not been directly proved, and the two persons best qualified to speak on this subject were not called to the stand. Calculations from the data accessible in the logs would seem to indicate that the speed testified to by the master and the second mate was prob-

ably an underestimate. The failure to produce the witnesses just referred to greatly strengthens the probability that the master's orders were not carried out. The New York, 175 U. S. 204, 20 Sup. Ct. 67, 44 L. Ed. 126. It cannot be denied that the course he laid would have carried the ship clear of the reef, and the fact of the stranding proves conclusively that the vessel did not keep that course. There is no evidence of sufficient disturbance by the wind and the waves to account for so large a deviation in so short a run. The captain's suggestion that the unsuspected event was caused by "a deviation of the current, which, from some meteorological cause, not explainable, carried, on the night of her departure, the water from west to east," although its usual flow was from east to west, has the misfortune to be mere conjecture, and to be opposed to all the testimony in the case concerning the ordinary direction of the current. The second mate offers the same explanation: "The only way that I can account for it is that a strong current sent us away from the coast of Java, driving us toward the reef." But the force of this suggestion is much weakened by what he says in the next sentence: "I assert, however, that we could not have anticipated this, since, as is well known, the current on the coast at that season flows for eighteen hours of the day from east to west, which drives one toward the island, and during the remaining six hours of the day the water is slack." And the ship's own log has this entry on the day of, but after, the stranding: "During the various run along the coast, we experienced a current which, when navigating toward the west, was carrying us toward the southwest, and when steering to the east would carry us to the southeast. In consideration of this fact, if the course followed was carrying us to the south of said reef, the current should have carried us still further south of it."

In this state of the proof it is inevitable, I think, to reject the master's explanation, and accept the much more probable theory that by some error or fault of the first mate the northwest course was carried too far, so that the second course took the vessel directly upon the reef. She certainly did strike the reef, and this theory accounts for that fact much more naturally than any other, and it does not conflict with any of the testimony in the case. The important witnesses for the libelant assume, in effect, that the master's instructions were carried out, although the essential and preliminary inquiry upon that subject is not assisted by a word of direct evidence, while the probabilities point, I think, in the opposite direction. If I have drawn the correct inference from the testimony and the lack of testimony in the case, it is unnecessary to pay any attention to the controversy concerning the precise place of anchorage at Samarang, the possible variation of the ship's compass, and the question whether the course laid by the master was true or magnetic.

The libel must be dismissed.