## THE ELKTON.

### COMPANIA GENERAL DE TABACOS DE FILIPINAS v. UNITED STATES.

District Court, E. D. New York. August 20, 1929.

No. 9444.

Bigham, Englar, Jones & Houston, of New York City, for libelant.

Howard W. Ameli, U. S. Atty., of Brooklyn, N. Y., and William E. Collins, of New York City, for the United States.

CAMPBELL, District Judge. The steamship Elkton, a 9,000-ton oil-burning ship, about 500 feet long, was at the times hereinafter mentioned owned and operated by the respondent, United States of America, as a merchant vessel in the common carriage of merchandise by water for hire, between various ports including the ports of Iloilo, Philippine Islands, and Manila, Philippine Islands, and the ports of Baltimore and New York.

On or about the 25th day of May, 1926, Salvador Serra shipped and placed on board the steamship Elkton, at Iloilo, Philippine Islands, four shipments of centrifugal sugar, of the following number of bags, respectively: Three shipments of 8,894 bags each and one of 6,634, aggregating 33,316 bags of centrifugal sugar, marked "S black."

On or about the 17th day of May, 1926, Lizarraga Hermanos shipped and placed on board the steamship Elkton, then lying at the port of Manila, Philippine Islands, 3,100 bags of centrifugal sugar, marked "H."

On or about the 25th day of May, 1926, Lizarraga Hermanos shipped and placed on board the steamship Elkton, then lying at the port of Iloilo, Philippine Islands, three shipments of centrifugal sugar of the following numbers of bags, respectively: one shipment of 6,795 bags marked "L black," one shipment of 8,765 bags marked "L black," one shipment of 1,213 bags marked "K S Co. black," aggregating 16,773 bags of centrifugal sugar, and with the 3,100 bags shipped by the same shipper aggregating 19,873 bags in all.

All of the foregoing described bags of sugar were received in apparent good order and condition, to be carried by the steamship Elkton as a common carrier to the ports of Boston, New York, Philadelphia, or Baltimore, optional, and there to be delivered in like good order and condition as when shipped to order, notify Compania General De Tabacos De Filipinas, in consideration of a certain agreed freight, and for which the respondent issued eight separate bills of lading, of the same tenor and effect, of which by proper indorsement the libelant became the owner prior to the commencement of this suit.

The steamship Elkton, with the said sugar shipments on board, sailed from Iloilo and Manila, respectively, and, prior to her arrival in adjacent waters of the United States, the

port of Baltimore was declared the port of discharge for the 33,316 bags of sugar marked "S black," which the Elkton delivered at the port of Baltimore, but not in like good order and condition as when shipped, but short and slack, with contents missing and damaged, tainted, and contaminated by contact with oil and other foreign substances.

The steamship Elkton thereafter proceeded to the port of New York, which port had been declared to be the port of discharge for the 19,873 bags of sugar marked "H," "L black," and "K S Co. black," respectively, and there delivered the aforesaid shipments of 19,873 bags of sugar, but not in like good order and condition as when shipped, but short and slack, with contents missing and damaged, tainted, and contaminated by contact with oil and other foreign substances.

The delivery of the said shipments of sugar at Baltimore and New York, respectively, but with parts thereof damaged by contact with oil, is admitted by the respondent, but it denies that such damage was due to any fault of the said vessel, the respondent, or its agents and other representatives, and the respondent contends that it is relieved from liability under certain provisions contained in the said bills of lading, which it sets forth in full in its answer.

It further contends that prior to the commencement of the voyage, the respondent as owner exercised due diligence to make the said steamship seaworthy, and that the said steamship was in fact, in all respects, seaworthy and properly manned, equipped, and supplied, and that any damages to cargo were due to causes within the exceptions contained in the bills of lading, and to errors in management or navigation, and to perils of the sea for which respondent is not liable under the said bills of lading, as well as under section 3 of the Harter Act (46 USCA § 192).

Compliance with the provision for giving notice of claim and the claim clause of the bills of lading is admitted.

The main question to be determined is whether the steamship Elkton was seaworthy, or, if unseaworthy, had the owner prior to the commencement of the voyage used due diligence to make the vessel seaworthy.

The sugar in question was loaded in No. 1 hold.

On the voyage out to the Philippines a survey was had at Shanghai, on May 6, 1926, American Bureau of Shipping, D. W. Murphy, surveyor, and we are concerned only with one finding, to wit, "tank top plating under No. 1 hatch slightly indented by hatch web falling. No outward signs of tank leaking," and recommending, "#1 double bottom tank to be kept empty or slack during homeward voyage and on arrival at home port, tank to be tested and repairs made if found necessary."

It was stipulated in the suit as follows: "While the Elkton was at Shanghai in May, 1926, there were at said port drydocking facilities with which further examination and tests of the vessel's #1 double bottom tank could have been made, and any repairs which might have been shown to be necessary could be effected."

No other inspection is shown to have been made before the Elkton completed her outward voyage and commenced her homeward voyage from Manila and Iloilo, Philippine Islands.

When the Elkton reached Honolulu, on her homeward voyage, she refueled for the entire trip to New York, and, although there was sufficient tank space excluding No. 1 double bottom tank, the chief engineer, Sullivan, ordered the second assistant engineer, Lover, to fill up all the tanks.

The filling of the tanks continued from 8:30 o'clock a. m. to 4:30 o'clock the same day, and the next morning a little more was taken on.

That day it was learned that there were a few feet of oil in the No. 1 hold.

Oil was then pumped from the bilge into the after peak and the deep tank, and then some was pumped out of the No. 1 tank.

On inspection and test after the arrival of the Elkton at New York, it was found that the sounding pipe was broken and that the tank top of the No. 1 double bottom tank leaked.

There was no evidence of any inspection or test of the sounding pipe and tank top before leaving Iloilo or Manila, and the only inspection shown of the tank top before leaving Iloilo or Manila was the survey made at Shanghai, on the outward voyage, when the surveyor recommended that the No. 1 bottom tank be kept empty or slack during the homeward voyage.

There is no evidence that the vessel encountered any heavy weather which could have caused the damage to the pipe, and this justifies an inference that the ship was unseaworthy at the beginning of the voyage, in relation to cargo stowed in the No. 1 hold, Work v. Leathers, 97 U. S. 379, 380, 24 L. Ed. 1012; The Southwark, 191 U. S. 1, 13, 24 S. Ct. 1, 48 L. Ed. 65; The Indrapura (C. C. A.) 190 F. 711, and the fact that the pipe was

encased did not relieve the respondent from the obligation to remove the casing for a thorough test and inspection. W. R. Grace & Co. v. Panama R. Co. (C. C. A.) 285 F. 718.

Steel vessels which carry sugar cargoes are subject to rapid deterioration, and, this danger being well known, required the respondent to take extra precautions to keep the vessel seaworthy, The Alvena (C. C. A.) 79 F. 973, The Julia Luckenbach (C. C. A.) 235 F. 388, affirmed 248 U. S. 139, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522; but there is no evidence that any precautions were taken.

I therefore find that the Elkton was unseaworthy at the beginning of the homeward voyage, when she left Iloilo and Manila.

Respondent, however, contends that it is relieved under section 3 of the Harter Act, but this contention is not sustained because the section of 'the act in question is to be strictly construed against the shipowner, The Irrawaddy, 171 U. S. 187, 18 S. Ct. 831, 43 L. Ed. 130, and, in order to secure the benefit of the exemptions provided by section 3 of that act, the respondent must prove that the vessel was seaworthy at the beginning of the voyage, or that it exercised due diligence to make her so, The Wildcroft, 201 U. S. 378, 26 S. Ct. 467, 50 L. Ed. 794, International Nav. Co. v. Farr & Bailey Mfg. Co., 181 U. S. 218, 21 S. Ct. 591, 45 L. Ed. 830, The Southwark, supra; and this the respondent has failed to do.

Even if the filling of the tanks and the failing to take soundings was an error in the management of the ship, as claimed by the respondent, that does not relieve the ship, because it has not been shown that the vessel was seaworthy or that respondent used due diligence to make her seaworthy.

The Silvia, 171 U. S. 462, 19 S. Ct. 7, 43 L. Ed. 241, cited by the respondent, is not in point, as the court held that the vessel was seaworthy, and the failure to fasten the iron ports, when the vessel left port, was an act of management of the ship.

The Touraine, 29 Lloyds List Reports, 265, 269, cited by the respondent, is not in point, as the ship was seaworthy at the commencement of the voyage, and the punching of a hole through a sanitary pipe leading from the crew's wash house, and causing damage to cargo, by a sailor who was trying to clear the pipe of refuse, was a negligent act of management of the ship.

There is, however, another important fact to be considered, and that is that there is no evidence that the chief engineer had any information in relation to the recommendation that the No. 1 tank be left empty or slack, and, as it was the chief engineer under whose supervision the tanks were filled with oil, his ignorance of the possible danger rendered the ship unseaworthy. Standard Oil Co. of N. Y. v. Clan Line Steamers, Ltd., 1924 A. C. 100.

Chief Engineer Sullivan's testimony could not be taken, because he was lost with the vessel on the succeeding voyage.

The testimony of Capt. Downing, who at the time in question was master of the Elkton, was not taken by respondent, as it claimed that he was apparently hostile to respondent, having refused, on the 24th day of June, 1929, to testify aboard the steamship Birkenhead, off Stapleton, Staten Island, and respondent gave notice to libelant that it did not intend to produce Capt. Downing as a witness, for the reasons last hereinbefore stated, and further notified libelant where Capt. Downing could be found if libelant desired his presence at the trial.

No presumption against respondent, therefore, arises as a result of the failure to call the master as a witness.

A decree may be entered in favor of the libelant against the respondent, with costs and the usual order of reference.