SARANTEX SHIPPING COMPANY,
Plaintiff,

v.

WILBUR-ELLIS COMPANY,
Defendant.

No. 73-722.

United States District Court,
D. Oregon.

Feb. 18, 1975.

John R. Brooke, Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for plaintiff.

Kenneth E. Roberts, Paul N. Daigle, Souther, Spaulding, Kinsey, Williamson & Schwabe, Portland, Or., for defendant.

## OPINION

BEEKS, Senior District Judge.

This case is a sequel to Wilbur-Ellis Company v. M/V Captayannis "S",[1] which arose from the grounding of the Captayannis "S" on Clatsop Spit at the mouth of the Columbia River in the State of Oregon on October 22, 1967. In that case, defendant herein sought to establish the liability of the vessel and its owner for cargo loss and damage. The case was dismissed by this Court on the basis of my finding that the loss resulted from the negligence of the master in attempting to proceed across the river bar in the circumstances then existing. In the present case, the owner of the Captayannis "S", Sarantex Shipping Company (Carrier), seeks to compel contribution in general average from the cargo consignee, Wilbur-Ellis Company (W-E).

At the time of stranding, the vessel was operating under a time charter from her owner to A. H. Basse A/S, and a voyage charter from Basse to Norsildmel of Bergen, Norway (Shipper). The voyage charter contemplated the shipment of a cargo of herring meal from Vedde, Norway to Portland, Oregon. It was during the course of this voyage the vessel grounded. Although the vessel was removed from the strand, and the cargo preserved largely intact, Captayannis "S" was found to be a constructive total loss. Upon release of the cargo to W-E, and in consideration therefor, Carrier secured a general average bond from W-E.

The issues tendered are whether Carrier is entitled to contribution in general average from Cargo, and, if so, whether W-E is liable under the general average bond for cargo's contribution.

## I.

Prior to enactment of the Harter Act,[2] an owner whose vessel was involved in a disaster resulting from negligence attributable to him could not recover contribution in general average.[3] The Harter Act served to immunize carriers from claims for loss of cargo even if the loss resulted from errors in the navigation or management of the vessel, so long as the carrier had exercised due diligence to insure that the vessel was in all respects seaworthy at the commencement of the voyage.[4] In The Jason[5] it was held that insofar as the Harter Act had relieved the shipowner from responsibility for the negligence of master and crew, it was no longer against public policy for him to contract with cargo owners for participation in general average in respect to losses arising out of such negligence. Since the Jason's bills of lading admitted the shipowner to share in the general average only under circumstances where, by the Act, he was relieved from responsibility, the provision in question, now

1. Wilbur-Ellis Company v. M/V Captayannis "S", 306 F.Supp. 866 (D.Or.1969), affirmed, 451 F.2d 973 (9th Cir. 1971), cert. denied, 405 U.S. 923, 92 S.Ct. 962, 30 L.Ed.2d 794 (1972).

2. 46 U.S.C. §§ 190–195.

3. See, The Irrawaddy, 171 U.S. 187, 189, 18 S.Ct. 831, 43 L.Ed. 130 (1897).

4. 46 U.S.C. § 192.

5. 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969 (1912).

known as the "Jason Clause," was held to be valid.

■ Under the more recent Carriage of Goods by Sea Act,[6] the shipowner's relief from liability for the negligent navigation or management of the vessel is not dependent upon proof of the exercise of due diligence to provide a seaworthy vessel at the inception of the voyage. Consequently, carriers have modified the Jason Clause to reflect the expanded immunity, and the "New Jason Clause" customarily provides that in the event of disaster arising from any cause for which the owner is not responsible by statute, contract or otherwise, cargo shall contribute with the carrier in general average.[7]

■ The bills of lading issued by Carrier provide that average, if any, shall be according to York-Antwerp Rules, 1950, but do not contain a Jason Clause in any form. However, the voyage charter, a copy of which was provided to W-E along with the bills of lading and insurance policy in connection with the subject shipment contains the following clauses: Paragraph 12, entitled "General Average," states:

"General average to be settled according to York-Antwerp Rules, 1950. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owner's servants (see clause 2),"

and Clause 2, entitled "Owner's Responsibility Clause," provides:

"Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by the improper or negligent stowage of the goods (unless stowage performed by shippers or their stevedores or servants) or by personal want of due diligence on the part of the Owners of their Manager to make the vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied or by the personal act or default of the Owners or their Manager.

"And the Owners are responsible for no loss or damage or delay arising from any other cause whatsoever, even from the neglect or default of the Captain or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this clause, be responsible, or from unseaworthiness of the vessel on loading or commencement of the voyage or at any time whatsoever."

*     *     *     *     *     *

On the facts of this case, these provisions are the legal equivalent of a Jason Clause in customary form. Thus, cargo is rendered liable for contribution in general average even when, as here,[8] loss was occasioned by negligence of Carrier.

## II.

Having found the existence of a general average situation, it must now be determined whether W-E, by virtue of its general average bond, is liable for cargo's contribution. The bond, entitled "Lloyd's Average Bond" was executed by W-E to Carrier as a condition of Carrier's release of the cargo to W-E. The bond recites the fact of the voyage, and the allegations of casualty, damage and sacrifice, and provides that for a con-

---

6. 46 U.S.C. §§ 1300–1315.

7. In full, a typical New Jason Clause provides as follows:

"In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequences of which, the Carrier is not responsible by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods."

Longley, Common Carriage of Cargo, § 21.07 [1] (1967).

8. Wilbur-Ellis Company v. M/V Captayannis "S", *supra* note 1.

sideration (release of the cargo), W-E agrees to pay to Carrier the general average contribution "which may be chargeable upon [W-E's] respective consignments . . . or to which the Shippers or Owners of such consignments may be liable to contribute . . ."

At trial the parties focused their attention on the issue of W-E's potential liability under the bond as "Shippers or Owners." The facts show that W-E was not the shipper and thus cannot be liable as such under the bond. Carrier contends that W-E acted merely as a sales agent for Shipper, and that under the bond W-E obligated itself for the contribution for which Norsildmel, as shipper and owner, is primarily liable under the de facto Jason Clause of the voyage charter. W-E's theory is that it is the owner of the cargo, title having been received from Shipper; that since Shipper had no title to the cargo at the time of the casualty Shipper cannot be liable in general average; and that W-E, not a party to the voyage charter, is not liable as cargo owner in general average in the absence of a Jason Clause in the bills of lading. Under these theories, therefore, ownership of the cargo at the time of the grounding is critical because W-E is liable in general average under the terms of the bond only if Shipper was owner of the cargo.

The evidence reflecting on ownership of the cargo is conflicting. The commercial relationship between Shipper and W-E and the long course of dealing between them is something of a hybrid: of the many elements of the relationship brought out in the record, several point to ownership in W-E while others are suggestive of a sales agency with title remaining in Shipper. Clearly this case does not involve a simple sale of cargo. The cargo was not paid for by W-E: rather, it was accepted essentially on a consignment basis. Shipper was paid only after W-E had sold the cargo, at which time W-E remitted the sales price, less its expenses and a commission of 2.5%, which was its only profit. However, since Shipper did not wish to be doing business in the United States, the transaction was structured in the nature of a C. I. F. shipment, with several indicia of ownership moving to W-E. Yet, although it appears that Shipper desired title to pass to W-E, it is not clear as to when title was to pass; whether on delivery, loading or discharge. In my view, however, determination of the issue of ownership is unnecessary for disposition of the case.

■ W-E's contention that, as cargo owner, it is not liable for contribution in general average in the absence of a Jason Clause in the bills of lading is based on an assumption that W-E was entitled to rely on the bills of lading as a complete statement of the contract of carriage. This is normally the case when the consignee is a purchaser for value without notice. The present case, however, involves a contract of private carriage, the terms of which are set forth in the voyage charter. W-E was in possession of a copy of the voyage charter and the policy of insurance in addition to the bills of lading. Such was the practice of the parties over a long course of dealing. In fact, it was necessary for W-E to have a copy of the charter to discharge the obligations undertaken by Shipper therein.[9] A bill of lading is a document generally used as both a receipt and a contract,[10] but where the shipper is also the charterer, the contractual element does not arise until the document is transferred.[11] As stated by Judge Wallace in The Fri,[12] quoting Carver, Carriage by Sea:

"The usual practice is for the master, or agent of the shipowner, to give bills

---

9. Obligations assumed by Norsildmel as charterer and discharged by W-E are set forth in the voyage charter and include discharging, wharfage, dockage, and terminal handling.

10. See, The Delaware, 14 Wall. 579, 81 U.S. 579, 20 L.Ed. 779 (1872).

11. United States v. Wessel, Duval & Co., 115 F.Supp. 678 (S.D.N.Y.1935).

12. 154 F. 333, 336 (2nd Cir. 1907).

of lading for the cargo, although it may be shipped under a charter party. When the charterer himself ships the goods these bills of lading operate as receipts for them, and also as documents of title which he can negotiate, and thereby constructively transfer possession of the goods. But they do not, as between the shipowner and the charterer, operate as new contracts, or as modifying the contract in the charter party. Where the bill of lading has been transferred for value to third persons who are strangers to the charter party, its terms become very important. It then constitutes an undertaking on the part of the shipowner with the holders, which is independent of the charter party, except so far as that is expressly incorporated in it."

W-E cannot claim to be a stranger to the charter party nor a person who has taken the bills of lading for value and without notice. In its relationship with Shipper, W-E was privy to the entire contract of carriage set forth in the voyage charter. Although some phases of the commercial dealings between W-E and Shipper support W-E's contention that it was a purchaser of the cargo, it was certainly not a purchaser without notice of the terms of the contract of carriage. Among those terms was the de facto Jason Clause, included in the voyage charter, binding cargo for contribution in general average.

 Upon the occurrence of a general average situation, there arises a quasi-maritime lien on cargo, which is dependent upon possession. As stated by L. Hand, Ct. J., in Det Forenede Dampskibs Selskab v. Insurance Company of North America,[13] "[t]he ship's lien upon cargo for general average is possessory only . . . and the master can enforce it only by retaining the goods."

Here, the lien on cargo arose from the de facto Jason Clause contained in the voyage charter to which Shipper was a party, and to which W-E was privy. It was a possessory lien which was waived, and the cargo released to W-E, only upon execution of the general average bond. Having given its general average bond under these conditions, W-E will not now be permitted to escape liability under the bond on the ground that it dealt at arms length with Shipper and relied on the bills of lading as the complete statement of the contract of carriage.

Accordingly, I find that W-E is liable to Carrier for contribution in general average, the amount of which has been determined by a general average adjuster and stipulated to by the parties.

The foregoing shall constitute my findings of fact and conclusions of law pursuant to Rule 52(a) Fed.R.Civ.P. Counsel for plaintiff is directed to prepare Judgment and Decree in accordance herewith.

---

13. 31 F.2d 658 (2nd Cir.), cert. denied, 280 U.S. 571, 50 S.Ct. 28, 74 L.Ed. 623 (1929). *See also*, Certain Bags of Linseed, Sears v. Willis, 1 Black 108 (1861) ; Cutler v. Rae, 7 How. 729, 48 U.S. 729, 12 L.Ed. 890 (1849) ; Id., 8 How. 615, 49 U.S. 615, 12 L.Ed. 728 (1849) ; Leggett & Co. v. 500 Cases of Tomatoes, 15 F.2d 270 (2nd Cir. 1926), cert. denied, 273 U.S. 761, 47 S.Ct. 475, 71 L.Ed. 878 (1927).