## THE HOG ISLAND (two cases).
### Nos. 8828, 8829.

District Court, E. D. New York.
March 14, 1930.

Finkler & McEntire, of New York City (Frank I. Finkler, of New York City, of counsel), for libelants.

Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City (L. de Grove Potter and Michael F. Whalen, both of New York City, of counsel), for claimant.

CAMPBELL, District Judge.

The two above-entitled suits were upon stipulation tried together, and, as they are for damages to parts of two shipments, upon the same vessel, from and to the same ports, one opinion will be sufficient.

The shipments in question were of bagged chestnuts, loaded on the steamship Hog Island, at Huelva, Spain, between November 20 and 23, 1925, and carried by the vessel from Huelva, which she left on November 24, 1925, direct to New York, where she arrived on December 7, 1925, started discharging on December 8, 1925, at 10:15 a. m., and finished on December 9, 1925, at 8:30 a. m.

The steamship Hog Island is a three-island steel steamer of 3,037 net tons, holding the highest class in Lloyds and the American Bureau of Shipping, and having five holds, three forward and two aft of the engineroom, divided into 'tween-decks and lower holds.

There is one ventilator on the port side forward and one on the starboard side aft, of each hold, except No. 5, which has one forward and two aft.

The cargo compartments of the vessel are equipped with the usual drainage, sounding, and pumping facilities.

There is a 2 to 3 inch wooden ceiling laid over 2 to 2½ inch battens in each hold, and on the sides cargo battens are placed over the ceiling about 8 inches in from the side of the vessel.

At Dede Agatch the holds were swept out, found dry and clean, and dunnage laid, and thereafter tobacco was loaded in No. 2 and No. 4 lower holds and No. 5 'tween-decks.

The vessel proceeded without incident to Huelva, where, between November 20 and 23, 1925, the chestnuts were loaded thereon. ·

2,691 bags of chestnuts, in jute bags, were loaded in the after part of No. 2 lower hold, on from one inch to two inches of dunnage, laid crisscross fashion over the wooden ceiling, extending from side to side of the ship within the cargo battens, not closer than 18 inches at the bottom, and as far as 12 feet to the after bulkhead.

The height of the lower hold was approximately 18 feet, and as stowed the bags were from the height of 4 feet aft to 7 feet in the forward end of the stow, and on top of these bags some 82 cases of chestnuts were stowed.

8,093 bales of tobacco were stowed, to a height of about 16 feet, forward of the bags, and separated from them by about 3 or 4 feet.

2,866 bags of chestnuts in jute bags were loaded in the after part of the No. 4 lower hold, on from one inch to two inches of dunnage laid crisscross fashion over the wooden ceiling extending from side to side of the ship within the cargo battens, not closer than 18 inches at the bottom, and as far as 12 feet to the after bulkhead, and to a height of about 4 feet in the after part to 7 feet in the forward part of the stow.

Immediately forward of the bags of chestnuts were stowed, on similar dunnage, 1,528 cases of chestnuts from side to side of the ship, to a height of about 8 to 10 feet.

A tunnel some 7 feet in height, dunnaged from the tank top of the hold by one-inch dunnage, in a crisscross fashion, divided the stow of cases and bags of chestnuts fore and aft.

7,665 bales of tobacco were stowed, to a height of about 15 feet, forward of the cases of chestnuts, from which they were separated by a space of about 4 feet.

1,423 bags of chestnuts, in jute bags, were loaded in the after part of the No. 5 'tween-deck on from one-inch to two inches of dunnage, laid crisscross fashion, extending from side to side of the ship within the cargo battens, not closer than 18 inches at the bottom, and as far as 12 feet from the after bulkhead. 279 cases of chestnuts were stowed forward of the bags of chestnuts.

The height of the 'tween-decks was 8 feet, and the height of the chestnuts as stowed was from 4 to 6 feet.

1,033 bales of tobacco were stowed forward of the chestnuts but separated therefrom by a considerable space.

Twelve to fifteen carloads, averaging 100 to 150 bags of chestnuts, were rained on and wetted one night while they were being loaded from open cars which were brought alongside the vessel.

No entry of this is found in the log, as such entries are not made when the ship is in port, but only when she is at sea.

The weather conditions during the voyage from Huelva to New York were shown in the

log, and it was the bad weather to be expected at that season of the year.

The weather ventilators were at all times properly trimmed, and at no time during the voyage were canvas covers placed over the cowls of the ventilators.

The hatch covers of the holds Nos. 2, 4, and 5, or the corners of such covers, were opened or lifted whenever the weather permitted during the voyage.

The 'tween-deck hatches between the lower holds Nos. 2 and 4 and the 'tween-decks above them were off.

On November 27th the officers observed sweat in the holds, and, on going below for examination, found the chestnuts heating.

The heat and sweat of the bags of chestnuts continued increasing, and the members of the crew were down in the hold shifting the bags of chestnuts to allow air to permeate through them.

The average temperature of the air during the voyage was around 60° F.

On examination after arrival in New York, 1,292 bags of chestnuts, which were mouldy and decayed, were condemned by the board of health.

No cases of chestnuts were condemned, but all were discharged with contents in apparent sound condition, whereas bags of chestnuts carried in the same compartments were condemned.

The bills of lading recited the receipt of the shipment in apparent good order and condition.

The bills of lading contain, among others, the following provisions:

"Quantity, quality, gauge, measurement, contents and value unknown. * * * "

"Except when caused by negligence on the part of the vessel owner the vessel, her owner or agent, shall not be liable for loss or damage resulting from heat, * * * decay, putrefaction, * * * sweat, breakage, leakage, drainage. * * *"

"15. *Perishable.*—Carrier does not undertake to carry perishables in refrigerated, cooled, heated or specially ventilated compartments unless specially contracted for herein. Perishables are accepted at risk of owner thereof, and neither the vessel nor her owner shall be liable for any loss of or damage to such goods unless caused by negligence from which the vessel and her owner are not relieved by the provisions of the Act of Congress of February 13, 1893, known as the Harter Act."

The damage resulted from heat, decay, putrefaction, and sweat, and therefore falls within the exceptions of the bills of lading, supra, and the burden of proving negligence was on the libelants. The Florinda (C. C. A.) 31 F. (2d) 262; The Arpillao (C. C. A.) 270 F. 426; The Solveig (D. C.) 217 F. 805.

The complaint of the libelants that the stowage compartments of the vessel were not fit because they did not have at least four ventilators, is not only not supported by the evidence, but the claimant has shown by a fair preponderance of evidence that two ventilators to a compartment are sufficient and customary for the carriage of perishable cargo, and such has been the holding of the courts in other cases. The Skipsea (C. C. A). 9 F. (2d) 887; The La Drome (D. C.) 43 F.(2d) 241, 1923 A. M. C. 825.

The evidence clearly shows that it was not the custom to dunnage between the tiers, and provide ventilating shafts, and the evidence shows to my satisfaction that the use of dunnage between tiers of bags of chestnuts would not produce better ventilation.

The only time that dunnage was commonly used between tiers was when the chestnuts were placed in cold storage.

The evidence is not convincing that the chestnuts should have been stowed in the 'tween-decks.

Some of the chestnuts in bags were stowed in the No. 5 'tween-deck, and a large portion of those chestnuts suffered from heat, decay, and putrefaction, showing that it was not the location of the chestnuts on the vessel that accounted for their condition, but rather the condition of the chestnuts themselves, and it is worthy of note that the chestnuts stowed in cases were apparently delivered in good condition.

The stowing of tobacco in the same compartment with chestnuts is shown by the evidence not to have been fraught with any danger to the chestnuts, as the tobacco was a dry cargo and would quickly absorb moisture.

The use of the tarpaulin over the tobacco did not prevent the libelants' shipments from being ventilated, because it did not extend from the ceiling to the deck.

The witnesses produced as experts by the libelants were four in number, and two of them, Captains Head and McLennan, were experienced navigators, while Mr. Lamia was a fruit merchant, who twenty-four years ago had served for a short time as supercargo on a small fruit steamer, and Mr. Worman was a surveyor without sea experience; but their

experience with the stowing and carrying of chestnuts was not only limited, but in each instance the chestnuts to which they referred had been carried some years ago, except in the case of Mr. Worman, who had seen four or five shipments in the last three years.

The libelants also called as witnesses Fred A. Cuneo and James S. Stokes, who were familiar with the importation of chestnuts, but neither of them testified as to the stowage of the shipments in question.

The claimant produced five witnesses as experts, and all had experience in the way chestnuts were stowed and carried at the time of the voyage in question.

I was particularly impressed with the testimony of Captain Marsden, a man with about thirty years sea service and eight years as port warden, and who as port warden of the port of New York surveyed the stowage of the Hog Island and found that in his opinion the stowage was proper and the compartments fit for carrying chestnuts; and also with the testimony of Mr. Cameron, pier superintendent of the Cosulich Line, who supervises the discharge and loading of all their vessels, who had been in the employ of that line as pier superintendent or assistant pier superintendent since 1910, and which line owned about eighty vessels trading to the Mediterranean. He also said that in his opinion the compartments in question were fit for the carriage of chestnuts, and that the stowage was ideal and better than usually seen.

The three witnesses, Mr. Campbell and Captains Anderson and Lynner, had experience of a late date in the stowage of chestnuts, the last two having had experience at sea, and all of them agree that the compartments in which the chestnuts were carried were good, and that the chestnuts were well stowed.

The chestnuts shipped on the Hog Island certainly had more ventilation than would ordinarily be given because she carried such a small cargo, and the hatches between the 'tween-decks and lower holds were open.

■ The Hog Island was seaworthy. The Titania (D. C.) 19 F. 101; The Dan (D. C.) 40 F. 691; Clark v. Barnwell, 12 How. 272, 13 L. Ed. 985; Hostetter v. Park, 137 U. S. 30, 11 S. Ct. 1, 34 L. Ed. 568.

The Hog Island was fit and her cargo of chestnuts was properly and well stowed, in the usual and customary manner, and as was said in Hostetter v. Park, supra, at page 40 of 137 U. S., 11 S. Ct. 1, 4, 34 L. Ed. 568:

"It is well settled that parties who contract on a subject-matter concerning which known usages prevail incorporate such usages by implication into their agreements, if nothing is said to the contrary."

Both Dr. Butler, plant pathologist of the United States Department of Agriculture, and Dr. Mathews, assistant director and bacteriologist of Pease Laboratories, testified that chestnuts are subject to the attack of mould and other organisms, which is the principal cause of heating, and that the breakdown of the tissue of chestnuts is caused only by such an attack or old age of the nut.

They further testified that chestnuts may be inoculated with these organisms and go through a period of incubation, during which time the diseased condition could not be detected, at least by the visual detection of a layman, and that, if chestnuts are shipped wetted or in wetted bags, the progress of their decay or deterioration would be much more rapid.

Some of the libelants' witnesses labored under the mistaken notion that wetting with salt water before shipment, would do harm, but that wetting with fresh water would not. This clearly is erroneous, as the wetting with fresh water before shipment would do as much harm as the wetting with salt water.

■ That the heating of the chestnuts on the Hog Island was caused by the attack of mould or some other organism before shipping, the progress of which was more rapid because of the wetting of the bags mentioned before they were loaded, is shown by all the facts and circumstances, and in particular by the fact that the chestnuts stowed in the 'tween-decks heated, as did those stowed in lower holds Nos. 2 and 4, and also because of the extent to which the heating had progressed on November 27th, about three days after sailing, notwithstanding the fact of the increased ventilation due to the smallness of the quantity of cargo in the holds, and also because large quantities of the chestnuts stowed in the same compartments with the chestnuts that were condemned were discharged in excellent condition.

My opinion is further strengthened by the fact that the chestnuts were picked, harvested, and bagged within a few days of loading, and undoubtedly were in quite a green condition with a high moisture content.

The effect of moisture seems to have been well recognized by the libelants' witness Mr. Cuneo, in the pamphlet written by him for the Italian Chamber of Commerce, in evidence in this action.

Objection was taken to some of the an-

swers to the depositions, and to the whole of one deposition, which were to be pointed out in the memoranda of the respective parties, but that has not been done. However, the objection to the testimony of Enrique Moron del Castillo, by power of attorney on behalf of his aunt Dolores Castillo, is sustained, and also the objection to the testimony of Juan Suarez Madero, given in the commission issued to Fernando Suarez, is sustained.

A decree may be entered in favor of the claimant against the libelants, dismissing the libels, with costs.