SPANG CHALFANT & CO., Inc., v. DIMON S. S. CORPORATION.

THE PACIFIC FIR.

DIMON S. S. CORPORATION v. SPANG, CHALFANT & CO., Inc., et al.

Nos. 312, 313.

Circuit Court of Appeals, Second Circuit.

April 18, 1932.

Bigham, Englar, Jones & Houston, of New York City (Henry N. Longley and James N. Senecal, both of New York City, of counsel), for appellants.

Harold V. Williams, of New York City (Harry D. Thirkield and Raymond E. Stefferson, both of New York City, of counsel), for appellee.

Before L. HAND, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

**L. HAND, Circuit Judge.**

The libelants libeled the claimant's ship Pacific Fir for damage to parcels of the cargo of that ship, on a voyage from Baltimore to Los Angeles; the claimant countered with a cross-libel in general average. The damage was incidental to putting out a fire which started in charcoal stowed in the same hold with the libelants' goods. Under section 182 of title 46, U. S. Code (46 USCA § 182), the ship would have a defense if the fire was not caused by "design or neglect," and that would be a preliminary issue. But it is not material to the cross-libel. Under The Irrawaddy, 171 U. S. 187, 18 S. Ct. 831, 43 L. Ed. 130, the ship cannot recover in general average, unless she be without fault, though she be excused under the Harter Act (46 USCA §§ 190–195). Not so, if she provides in the bill of lading for general average in that event. The Jason, 225 U. S. 32, 32 S. Ct. 560, 56 L. Ed. 969. The bill of lading did have such a clause; that is, the ship stipulated for general average in the case of any "damage or disaster resulting from * * * unseaworthiness," if due diligence had been used to make her seaworthy and properly to equip her. The bill did not, however, reserve the same right in the case of fire which was not the result of the neglect of the owner, and the cross-libel cannot therefore succeed, merely upon showing that in this case the fire was so caused. Whether a clause worded to cover such a case would be equally valid we need not say. Nor can the cross-libel succeed under the clause just quoted so far as the fire was the result of unseaworthiness, for that, if it existed at all, was due to the ship's design and known to the owner. Therefore at least as regards the cross-libel, the bills of lading may be disregarded, and the case is open on the merits. Since in our opinion it must succeed, it carries with it an affirmance of the decree so far as it also dismissed the libels.

The fire started in hold 4, just abaft the engine room. In this the ship had stowed a quantity of charcoal at Norfolk, the 'tween decks being already full. The whole stow of this hold was in four blocks; the first, abaft the bulkhead which separated off the engine room, contained a part of the charcoal. Next came a block of baled cotton waste and general cargo, stowed up to within three feet of the 'tween decks, the after end of which came under the square of the hatch. Three feet abaft this, the rest of the charcoal was stowed in the third block, under the square of the hatch; and the after end of the hold was filled by a fourth block which may be disregarded, for the fire started in the charcoal of the third. At the bottom of this were "grinding balls," above which were cases of copper sheets, and on top of these barrels of soda ash, stowed on end, coming up to a point a little above the level of the tunnel shaft. The charcoal, in particles of about the size of a pea, was packed in paper bags covered with jute, and stowed upon dunnage, laid fore and aft upon the top of the barrels. It filled the ship from wing to wing, five bags high amidships, and twelve at the wings; leaving a space of three feet above the top of the stow at the wings, and seven feet amidships. There was a space of some sixteen inches between the skin of the ship and the sides of the stow. The fire started in the center of the stow, in the first or second tier from the surface.

The block of cotton waste was protected at its after end by two tarpaulins, meant to keep off charcoal dust. The libelants bear heavily upon the master's direct testimony that these ran across the hold from batten to batten, close up to the 'tween decks, effectively cutting off ventilation through the top of the hold. It is, however, entirely plain that this was not the case, but that at the center the lapped ends of the tarpaulins lay upon the top of the block, being held in place by some boilers. Indeed, the master's direct testimony is consonant with this conclusion. They did not therefore substantially obstruct the ventilation. Charcoal is a substance subject somewhat rarely to spontaneous combustion. Its chief period of danger is within three days after it is made, when it absorbs gases and generates heat, especially if in powdered form. The larger the pieces, the less the danger. It did not appear how old this charcoal was when shipped, except that it had come to Norfolk by rail; or whether it had been wet en route, which makes it more combustible; but it had been on board for ten days before the fire broke out in the Pacific.

The first fault charged is that it should not have been shipped in the hold at all, but in the 'tween decks. Master mariners testified both ways as experts, but the judge who saw them was not convinced by those who said that the hold was worse; and the record does not show that he should so have found. It is indeed doubtful à priori whether the hold is not the better place, at least in the tropics, though there are indeed sub-

stantial authorities who maintain that the 'tween decks is always better ventilated, particularly because the hatches can be taken off. Perhaps so, but, on the other hand, being immediately under the shelter deck, the 'tween deck was exposed to the full force of the tropical sun and its heat was not moderated by the water which covers the sides of the hold. Indeed, in the case at bar the temperatures within the hold were the same as those of the sea. The cross-section of that part of the ventilators leading to the hold is substantially greater than that left for the 'tween decks, though this is in some measure balanced by the longer carry to the hold, and presumably by a greater resulting friction. While the cubic capacity of the hold is greater, the draft will depend upon the spaces kept unfilled, since it is through these alone that the air can pass. It is impossible to know whether the volume of these was greater in the hold as stowed than in the 'tween deck. As we cannot tell what the resultant of all these factors was, we must depend upon those whose greater experience gives their estimates, even if no better than honest guesses, more weight than our speculations. We see no reason to suppose the claimant was wrong in choosing the hold, even if the 'tween deck was better ventilated, as perhaps it was.

The stowage, as such, was proper. Much is made of the fact that the bags were crosspiled at the wings, but nothing followed from that. The fire started, not there, but amidships, as we have said, and that too at the surface or only one tier below. Any defect in the stowage due to close packing, or indeed to too great a mass without interior ventilation, must therefore be put aside. Had the fire begun deep within the block, it would perhaps be plausible to argue that had channels ("rice ventilators") been run through, the ventilation would have been better. But even so, there would almost certainly have been at least two tiers without channels, and the fire would have been as likely to start as with things as they were. Moreover, the necessity of such ventilators was disputed and not proved. Beneath the block and between the soda ash barrels there was a course for the air; the thickness of the stow in the middle was scarcely more than three feet (five bags); at each wing was a passage at the sides of at least a foot, and above the center, as we have said, seven feet. Assuming it to be proper to stow the charcoal in the hold at all, we cannot see that the stowage can fairly be criticized.

There remains the question of whether the ship was herself properly equipped. Hold 4, and for that matter all the holds, had but two ventilators; one forward on the starboard side, the other aft and to port. The forward cowl was as usual turned to the front, the after one back, thus taking advantage of the ship's motion to secure a draft. The Pacific Fir was one of many fabricated vessels built during the war at Hog Island after a single design. At that time and until not long before the voyage in question it was customary to build ships with only two ventilators, though latterly these have been doubled, no doubt an improvement. But two ventilators may be enough [The Hog Island (D. C.) 43 F.(2d) 243, affirmed 48 F.(2d) 101 (C. C. A. 2)]; shippers are not entitled to the latest design; ships, well built in their time, may still carry cargo unless they become so clearly out of fashion as to be an anachronism. Adams v. Bortz, 279 F. 521 (C. C. A. 2). The shipper bargains for no more than usual carriage.

There is no doubt that when the fire broke out the ventilation had gone dead. The smoke was first discovered coming, not from the hold 4 at all, but from the kingpost of hold 3, separated from it by the whole reach of the engine and fire rooms. To find this exit it had been obliged to pass through the hatch covers of the 'tween decks in hold 4, go forward through that deck and the former bunker spaces on the wings of the ship (she was an oil burner at the time), and so to the 'tween decks of hold 3, from which it could emerge through the kingpost. Thus not only was there no draft in hold 4, but equally none in the 'tween decks above. Why this should have happened nobody could tell. Though the wind was light, the ship was headed into it and had a speed of eleven miles of her own. If the ventilators were in fact trimmed properly, there should have been some draft at least in both holds. Possibly they were not in fact, in spite of the testimony, though, if so, it was but a fault in management.

In any case a temporary breakdown does not prove bad design; four ventilators would probably have been as useless as two, for we are to assume that there was no draft whatever. For some unexplained reason the system had become dead; but this does not affect the proof of the ship's seaworthiness. It is, however, material in two respects: First, it makes against any argument designed to prove that the tarpaulins blocked

the draft in the hold. Second, it shows that at that time at least the 'tween decks was as poor a place for the charcoal as the hold. True, this condition may have been only temporary; the charcoal may have been heating slowly while the 'tween decks were better ventilated than the hold, and have ignited at that time because of the temporary breakdown in both. But this is clearly speculation; all we know is that at the actual outbreak of the fire the ventilation was as dead in one as the other.

■ Thus the ship was seaworthy, and at least it does not appear affirmatively that the fire was caused by improper stowage. We need not decide whether in a libel for general average the ship must show herself seaworthy to recover [The Lewis H. Goward (D. C.) 34 F.(2d) 791, 793]; the cases are not uniform [Broadnax v. Cheraw & Salisbury R. R., 157 Pa. 140, 27 A. 412]. Courts of admiralty are sensitive in all matters which touch the fitness of a ship for her work. But as to other faults the claimants had the burden. Gregory v. Orral (C. C.) 8 F. 287. As in suits on contracts of carriage, the shipper, though at a disadvantage as to getting at the evidence, must establish the fault, for it is not usual to require a party to prove a negative; prima facie it is enough for the ship to show that the loss arose from a common sacrifice. Whatever may be the doubts here, certainly the cross-respondents did not prove that the fire was caused by bad stowage.

Our discussion of the merits of the cross-libel answers all questions arising under the libels, even though we disregard the fire statute.

Decree affirmed.