SCHROEDER BROS., Inc. et al.

v.

THE SATURNIA et al. (ITALIA SO-
CIETA ANONIMA DI NAVIGA-
ZIONE, claimant-respondent).

Civ. A. 160–336.

United States District Court,
S. D. New York.

July 21, 1954.

Bigham, Englar, Jones & Houston, New York City (F. Herbert Prem, New York City, Advocate), for libellants.

Haight, Deming, Gardner, Poor & Havens, New York City (John C. Moore and Tallman Bissell, New York City, Advocates), for claimant-respondent.

## 284

EDELSTEIN, District Judge.

This is an action in admiralty for cargo loss and damage sustained by shipments of fresh chestnuts, delivered to claimant-respondent (hereinafter called respondent) as a common carrier, at the ports of Genoa and Naples, in the latter part of October and the early part of November 1948, for carriage to New York, on the motor vessel Saturnia, owned and operated by the respondent. The cargo was stowed both in the refrigerated chambers of the vessel and in her unrefrigerated common holds. The Saturnia arrived at New York on November 14, 1948, but was unable to discharge cargo because of a longshoremen's strike. She returned to Naples, arriving on November 26. Respondent made a conditional offer to shippers to permit discharge of the chestnuts at Naples, but after a good deal of confusion, which is the subject of dispute, the vessel proceeded on the same day to Genoa. At Genoa the respondent engaged a chestnut expert to examine the cargo and he reported that they were healthy, although "stanca", or tired, and still able to support the voyage "provided that during the navigation it is maintained in sufficient aeration, above all to avoid infiltrations of dampness." From Genoa the Saturnia proceeded again to New York, for a third transatlantic voyage, arriving on December 10, and when the chestnuts were discharged, after having been in stowage from 37 to 41 days, they outturned damaged; that is, the shipments were in whole or in part, affected by one or more of the following conditions: hot, warm, sweated, moist, mouldy, sprouted and decomposed.

■ The shipments having been transported between Italian ports and the port of New York, the rights of the parties are governed by the U. S. Carriage of Goods by Sea Act, 46 U.S.C.A. § 1300 et seq. In order to make out a *prima facie* case, the shipper must prove that his goods were loaded in good condition and outturned damaged. "The burden then lies with the carrier to exculpate itself by proving (a) that the harm resulted from an 'excepted cause', a cause for which it is statutorily not liable, or (b) that it exercised due diligence to avoid and prevent the harm". American Tobacco Co. v. The Katingo Hadjipatera, D.C., 81 F.Supp. 438, 445, modified and affirmed, 2 Cir., 194 F.2d 449; General Foods Corp. v. The Troubador, D.C., 98 F.Supp. 207; Union Carbide & Carbon Corp. v. The Walter Raleigh, D.C., 109 F.Supp. 781, affirmed, 2 Cir., 200 F.2d 908; see Schnell v. The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373. The respondent here relies on the statutory exceptions of strike and inherent vice, 46 U.S.C.A. § 1304(2) (j) and (m). If a carrier establishes that damage is caused by one of the enumerated exceptions, it will not be held liable unless it appears that its negligence contributed to the damage, and the burden of proof upon that issue is upon the libellant. Schnell v. The Vallescura, supra; Pettinos v. American Export Lines, D.C., 68 F.Supp. 759, affirmed, 3 Cir., 159 F.2d 247.

■ There is no dispute that the chestnuts outturned damaged at New York, and I hold that the libellants have established that they were in good condition when delivered to the carrier. Respondent contends that the libellants failed to establish proper preshipment treatment of the chestnuts and further failed to prove the essential element of moisture content. See American Tobacco Co. v. The Katingo Hadjipatera, supra, 81 F.Supp. at page 447. But in view of the testimony of respondent's expert, Dr. Vitagliano, I have no hesitancy in crediting the testimony of libellants' experts to the effect that proper and customary preshipment treatment was given. Dr. Vitagliano displayed only a limited acquaintance with the subject and the character and content of his testimony left much to be desired. There was no precise proof of moisture content, but there was adequate proof that the chestnuts were dry, proof as adequate as the shippers could be expected to produce in the circumstances. But the dispositive fact on this issue is the

fact that when respondent's expert examined the chestnuts in Genoa, after they had been in stow for about 24–27 days, he found them in good condition, and Dr. Vitagliano, himself, testified that if the preshipment treatment were improper, mould would develop within 20 days. Libellants' experts testified that mould would develop within a "few days".

█ The respondent vigorously argues that the damage was the result of the New York longshoremen's strike, under the statutory exception, which resulted in the inability to discharge the cargo after its first transatlantic crossing. The argument does have force, but I have reached a contrary conclusion. After the failure to discharge cargo at New York because of the strike, respondent sent a circular letter to shippers notifying them of the expected arrival at Naples of the Saturnia on November 26, and further stating that if the shippers desired to have their cargo unloaded they would have to give timely instructions to its Naples agent and present complete sets of bills of lading, or, in lieu thereof, bank guarantees. (The bills of lading, unknown to the parties in Italy, had already been surrendered by the consignees, libellants' agents.) Before the vessel's arrival at Naples a representative of the shippers conferred with the respondent's agent and reached an agreement for the discharge of the common hold chestnuts, providing for the presentation by the shippers of certain bank guarantees. The shippers appeared on the dock early in the morning of the ship's arrival, and what thereafter occurred is a welter of confusion. But the common hold chestnuts were not discharged. The respondent contends that the shippers did not want their chestnuts unloaded, nor did they comply with the conditional offer to discharge (an agreement being denied). Suffice it to say that I am not convinced that the shippers did not want their chestnuts discharged, although the apparent display of volatile temperament does obscure the issue somewhat. But I do find

an agreement to discharge and compliance with both that agreement and with respondent's conditional offer. Respondent urges that the bank guarantees provided for in the offer (and in the agreement) were not produced. It is true that most of the guarantees acquired by the shippers were of the "fidejussione" variety, which the respondent was unwilling to accept on the ground that it provided insufficient protection. However, two of the shippers did produce the proper type, "garanzia". These guarantees were apparently ignored. I conclude that the respondent was not interested in compliance with the condition of the production of bank guarantees, that it waived such a condition, and that the nonpresentation of guarantees was not the reason why the Saturnia did not discharge her common hold cargo at Naples. The cargo was not discharged because the respondent, for its own reasons, desired to advance its sailing time and was unwilling to afford the shippers the time and opportunity to have their common hold cargo discharged. Since the chestnuts were in good condition at that time, as disclosed by the later inspection in Genoa, and since the respondent was unjustified in refusing to permit discharge of the common hold chestnuts in Naples, I find that the strike was not the cause of damage, but that on the contrary the respondent's refusal was the proximate cause of the loss and damage suffered by that cargo.

█ However, even if it be considered that the respondent did bring itself within the statutory strike exception, I am nevertheless of the opinion that the libellant has satisfactorily borne the burden of proving negligent stowage contributing to the loss. There was a mass of conflicting and sometimes inconsistent expert testimony on the issue of stowage and it is a tedious task to pick one's way through the maze in order to come to a satisfactory conclusion. The major bone of contention was whether it was necessary to use dunnage in the stowage of chestnuts, living, respiring organisms which give off moisture and

gases during the respiration process. If there is inadequate circulation of air around and through the containers, heat and mould will result. The shippers were entitled to the "usual and ordinary stowage sufficient to meet conditions reasonably to be anticipated." The Terne, D.C., 1 F.Supp. 537, 542; Spang Chalfant & Co. v. Dimon S. S. Corp., 2 Cir., 57 F.2d 965; The Hog Island, D.C.E.D. N.Y., 43 F.2d 243. The conditions encountered, involving three transatlantic journeys, were perhaps not reasonably to be anticipated. But the question remains whether the stowage was usual and ordinary. The fact that unusual conditions were met and the cargo damaged does not dictate a causal relationship, nor does the fact that after the usual first crossing, or even second, the cargo was undamaged prove that the stowage was up to the usual and ordinary standard. There was a conflict in the testimony of stowage experts on whether dunnage was usually employed in the stowage of chestnuts. On the evaluation of their testimony alone, I reach the conclusion that the usual and normal stowage of chestnuts requires the use of dunnage in order to effect the necessary ventilation, both in the common holds and in the refrigerated compartments, compare The Hog Island, supra. Certain engineering testimony reinforces this conclusion. While there is no evidence precisely indicating that the usual and normal carriage contracted for imports the same conditions of stowage that would prevail in a shore warehouse, nevertheless it is established, by witnesses on both sides, that there is no difference between the application of refrigeration principles to a problem of stowage aboard a ship and stowage in a shore warehouse. The requirements for the successful refrigerated stowage of chestnuts ashore include dunnage, and chestnuts so stowed will remain in sound condition for a much longer period than here involved. Therefore, it seems reasonable to conclude that dunnage is necessary to the successful stowage of chestnuts aboard ship in refrigerated compartments, and I am the more inclined to credit such testimony and to disbelieve contrary testimony. Indeed a witness for the respondent testified that chestnuts stowed in a refrigeration compartment should outturn "relatively cool", and admittedly some of the libellants' did not. The stowage in the common holds was the same as the stowage in the refrigerated chambers. And if the type of stowage in the refrigrated chambers caused the damage of the chestnuts, the same type of stowage in the common holds contributed to the damage of the chestnuts there stowed. Regardless of the legal incidence of the burden of proof, libellants have proved that inadequate stowage caused damage to the chestnuts in both the common holds and the refrigerated compartments and certainly, the respondents have not met any burden of proving the contrary.

The second statutory exception relied upon by the respondent is that of inherent vice. "Whenever the defense of inherent vice is raised, and it appears that the damage arose internally, it self-evidently calls into question the good condition of the goods upon shipment * * *" and under The Niel Maersk, 2 Cir., 91 F.2d 932, certiorari denied, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582, " * * * the shipper must affirmatively establish the good condition at time of shipment of goods damaged by heating, where the carrier claimed the cause to have been inherent vice." American Tobacco Co. v. The Katingo Hadjipatera, supra, 81 F.Supp. at page 446. As I have already indicated, the libellants have met their burden. The respondent may not avoid liability on the ground of inherent vice.

Accordingly, I make the following findings of fact and conclusions of law.

### Findings of Fact.

1. In the latter part of October and the early part of November, 1948, 58 shipments of fresh chestnuts were delivered to claimant-respondent, hereinafter referred to as "respondent", at the

ports of Naples and Genoa for carriage to the port of New York on the motor vessel Saturnia, owned and operated by respondent; bills of lading were issued therefor by duly authorized agents of respondent, and agreed freight charges paid thereon.

2. The 58 shipments contained a total of 12,064 cases and barrels, of which 7,721 were stowed in the refrigerated chambers of the Saturnia and the remaining 4,883 in her unrefrigerated 'tween decks and lower holds. All of the common hold shipments were loaded at Naples. All of the shipments loaded at Genoa, and some of those loaded at Naples were stowed in the refrigerated compartments.

3. Upon completion of the loading at Naples on November 3, 1948, the Saturnia proceeded to New York, arriving there on November 14, 1948; but, because of a longshoremen's strike, no cargo was discharged and the vessel returned to Naples and Genoa. The Saturnia arrived at Naples on November 26, 1948, at 6:00 a. m. and proceeded to Genoa on the same date at 1:00 p. m. She thereafter returned to Naples, from which port she proceeded to New York for a third voyage with libellants' shipment still on board.

4. Upon the discharge of libellants' shipments from the Saturnia at New York between December 10 and 13, 1948, every consignment was damaged by one or more of the following conditions: heated, sweating, moist, mouldy and decomposed. Some of the shipments were discharged from the refrigeration compartments hot. A quantity of the cargo was condemned and ordered dumped by Federal health authorities; and a further quantity was reconditioned and sold below sound market values.

5. By written notice given six days before the return of the Saturnia to Naples, respondent informed the shippers that the vessel would discharge their cargo at that port if timely instructions were given and bills of lading or bank guarantees made available. Prior to the arrival of the Saturnia at Naples, the shippers, through their forwarding agents, or Dr. Serafino, their counsel, demanded the discharge of the common hold chestnuts and agreed with Mr. Desda, respondent's agent, for the discharge of the same. Of the 18 shipments of Naples common hold chestnuts bank guarantees for 15 had been secured by their shippers before the Saturnia's arrival at Naples. Two of the said guarantees, in form acceptable to respondent, were delivered to respondent prior to the Saturnia's return to Naples, but respondent did not make delivery of the shipments covered thereunder.

6. On the early morning of November 26, 1948, the date of the Saturnia's return to Naples, the shippers assembled on the dock with their vehicles to remove their respective lots of chestnuts. At 11 o'clock a. m. they were invited to go aboard the vessel, where they were informed that for absolutely necessary reasons, and because of orders received from respondent's home office at Genoa, the vessel would sail at 1:00 p. m. that day. The shippers protested the early sailing and notified respondent that it would cause them very serious loss; a formal protest was thereupon written on board the vessel and signed by the shippers and respondent's agent. The Naples shippers made timely demand for the discharge of their common hold cargo, and respondent refused to comply therewith.

7. Respondent's refusal to discharge was based upon instructions received from respondent's home office on the morning of November 26, 1948, the date of the Saturnia's return to Naples. Respondent's decision not to discharge the Naples cargo was predicated upon its desire to maintain the sailing schedule of the Saturnia and to perform routine engine repairs; and not because of respondent's asserted claim that bank guarantees were withheld by the shippers. The Saturnia could have completed another transatlantic voyage without making the proposed engine repairs at Genoa. On prior occasions respondent had always delayed the sailings of its

ships in order that cargo might be discharged to protect shippers' interests. Respondent knew that the common hold cargo could not be carried on a third voyage without "great damage". The master of the Saturnia considered it inadvisable to carry the common hold chestnuts on a third voyage.

8. All of the shipments were examined at Genoa between November 27th and November 29th, by Dr. Rossi, an expert surveyor of chestnuts, employed for that purpose by respondent's home office at Genoa. Upon that inspection the chestnuts were healthy, fresh, free from mould, although "tired" (stanca). The "tired" (stanca) appearance of the common hold chestnuts indicated that they should not be forwarded on a third transatlantic crossing without being refreshed in a cold water bath. A fresh water bath would have enabled such chestnuts to withstand safely a third transatlantic voyage under normal conditions of stowage. The Naples shippers desired their common hold chestnuts to be discharged at that port to enable them to ascertain their condition and, if found to be "stanca", the chestnuts would have been given a cold bath, or new quantities substituted, for the third crossing. A condition of "stanca" would have been observable immediately upon opening the packages. The condition of "stanca" did not affect the value of the chestnuts in Italian markets and, after being refreshed in cold water, they would have had their original value.

9. Upon the Saturnia's return to Naples the necessity existed, by reason of the "stanca" condition, for the discharge of the common hold chestnuts, apart from the added peril to which the common hold chestnuts would be subjected, if sent forward on a third crossing under the existing stowage conditions of no dunnage. As the common hold shipments were in good condition on November 26, 1948, when the Saturnia returned to Naples, no question as to the sufficiency of the preshipment treatment given those shipments, or as to the character of stowage provided by respondent, are presented in determining the question of respondent's liability for their loss and damage. The shipments being sound upon the return of the Saturnia to Naples from New York, the strike at the latter port caused no damage to the chestnuts and consequently the shippers would have sustained no loss had respondent discharged their common hold cargoes at Naples.

10. Prior to the Saturnia's return to Naples, the shippers, through the filing of a petition in a Naples Court secured the appointment of an official surveyor, Dr. Bianco, to inspect the Naples cargo. The 1:00 p. m. sailing permitted Dr. Bianco but 90 minutes to draw samples of the cargo, which was insufficient. Respondent's invitation to the official surveyor and the shippers to remain on board the Saturnia for the five day round trip voyage between Naples and Genoa, made 2½ hours or less before the 1:00 p. m. departure, was an unreasonable one.

11. The chestnuts were shipped in ventilated standardized barrels and cases designed under Italian law for the exportation of chestnuts. The chestnuts, both in the refrigerated compartments and in the common holds, were stowed in the same manner. The stowage of the 58 shipments was performed under the direction and control of the respondent. The cases, which were bound at either end by 5/16 inch withes, were stowed tightly from the batten boards on one side of the ship to the batten boards on the other side, with ventilation space provided by the withes. Dunnage was used underneath the stow and at intervals to make it secure and to distribute the weight. Dunnage was not used between the tiers for ventilation purposes. The barrels were stowed end up with the bilge of each tight against the bilge of each adjacent barrel. Underneath the barrels in the refrigerated compartments were gratings raising the stow from the deck for the circulation of air. No dunnage was used except to distribute the weight and secure the stow.

12. Chestnuts respire and during the respiration process, moisture and gases

are given off, which, if not controlled by circulation of air around and through the cases and barrels, will cause heat and mould to develop. Proper circulation of air is vital to the safe carriage of chestnut cargoes, whether stowed in common holds or under refrigeration. The use of dunnage will arrest and control the development of heat and mould. The use of dunnage in the storage of cases and barrels of chestnuts is essential and it is the practice and custom to use dunnage. While the practice of using dunnage between tiers varies, it being used at times between every tier and, on other occasions, between every second or third tier, there is, however, an established practice and custom of using dunnage in the stowage of tiers of cases and barrels of chestnuts. The necessity for the use of dunnage in the storage of chestnuts under refrigeration is the same in a shore warehouse as on shipboard.

13. Chestnuts under refrigeration will, if properly stowed, through use of dunnage and maintenance of proper temperatures, remain in sound condition for periods as long as one year. Respondent conceded that, under certain circumstances, chestnuts can be carried safely for the time required for three transatlantic voyages. Chestnuts carried under normal refrigeration and stowage conditions will outturn at about the same temperature as was maintained in the compartment. The additional length of time the refrigerated cargo was kept on board after the first voyage, by reason of the strike at New York, would have been of no consequence had the cargo been properly dunnaged as chestnuts can be maintained in good condition in refrigerated storage for periods of one year or longer under normal stowage and temperature conditions.

14. The custom, practice and necessity of using dunnage between the tiers of cases bound by withes is established not only by the libellants' experts, but it is bolstered by some of the testimony of Sandri, the Saturnia's cargo officer.

15. The stowage of libellants' shipments of chestnuts on the Saturnia was not performed in accordance with established practice and custom. The competent producing cause of the heated, sweated, moist, mouldy and decomposed condition of the chestnuts at New York was respondent's failure to use dunnage, which omission deprived the chestnuts of essential circulation of air required for normal carriage of this cargo.

16. The establishments where the 58 shipments were prepared for export extend from the foothills of the Alps in the Piedmont district of Italy to the Avellino and Salerno districts south of Naples. Of the 37 shippers in this action 17 had from 30 to 50 years experience in the preshipment treatment of chestnuts and 7 from 15 to 25 years. The preshipment treatments given by the shippers herein to their respective consignments, were the same as given by them to all their prior shipments throughout their extended experience. All of the shipments were given hot water baths, the purpose of which is to destroy insect infestation; none of the shipments were infested upon delivery at New York.

17. All of the chestnuts were given cold water baths, the purpose thereof being to refresh and preserve them; this treatment also caused defective nuts to float to the surface. Every shipment from the Avelino and Salerno districts received a cold bath of varying periods, all of which were in excess of the ½ hour minimum period designated as sufficient by Dr. Russo to protect them from mould development. Dr. Vitagliano, respondent's sole witness upon the subject of preshipment treatment of chestnuts, having never seen the preparation of establishments in the Cuneo area, was not qualified to express an opinion as to the existence of a custom for that area. All of the chestnuts shipped from Genoa, which originated from the Cuneo area of the Piedmont district, being of a thin skinned variety, were given a few minutes immersion in cold water, which the Chief of the Italian Government inspection office for that district testified, was sufficient and in accordance with custom. After the hot and cold baths, the nuts

were placed on the floors or platform of the warehouses and massed, heaped and shovelled from time to time until they were dry. They were then graded, polished and packed, at which time further opportunity was presented for inspection.

18. The Italian Government has created an inspection bureau to examine and certify the quality and condition of chestnuts intended for export, and that Government has promulgated a decree which prescribes the requirements of quality and condition the chestnuts must possess before they are given approval and official certification for export. The requirements specified in the decree are that the chestnuts must be

"whole, sound, full, dry, clean and of normal shape and appearance. Fruit with traces of mould on the shell, injured, empty, sprouted fruit, or fruit having defects which impair its preservation, edibility, or to any substantial extent, its appearance, is to be considered not fit for export."

Every shipment in this action was examined by an experienced Italian Government inspector, within a day or two prior to loading on the Saturnia, and approved as being dry, sound, free from mould and otherwise conforming to all of the other requirements contained in the aforementioned decree. Government certificates for each shipment were thereupon issued as evidence of such inspection and approval. The Italian Government inspectors, as well as Dr. Russo, respondent's surveyor at Genoa, conducted cutting tests of the chestnuts to ascertain the condition of the pulp and found the same to be sound.

19. If the preshipment baths and other treatments given by the shippers herein were not proper, the chestnuts would have developed mould within a few days. Dr. Vitagliano, respondent's witness, testified that mould would develop around twenty days after treatment if the preshipment treatment was improper. The examination of the said shipments by Dr. Russo, respondent's surveyor, at Genoa, who found them to be healthy and free from mould, after being in stowage from 24 to 27 days, confirms that the preshipments baths and other treatments given the chestnuts herein were proper and adequate and that the chestnuts were in sound condition when shipped.

20. Dr. Vitagliano's experience in visiting six establishments in the Avellino district, between 1944 and 1948, is too limited to qualify him to express an opinion as to the existence of a custom and practice in the preshipment preparation of chestnuts for export in that district. Dr. Vitagliano's experience in visiting 3 or 4 establishments in the Salerno district where chestnuts were given preshipment treatment for export, between 1945 and 1948, is too limited to qualify him to express an opinion as to the existence of a custom and practice in the preshipment preparation of chestnuts in that District. Eighteen of the shippers herein (who made 39 of the 58 shipments in this action) are located in the Avellino district and they did not use the three day stagnant cold water treatment advocated by Dr. Vitagliano; and since he knows of only six establishments in that district where such treatment was given, if any custom and practice existed as to preshipment treatment, it is the treatment given by the shippers herein who have followed this practice for periods up to 50 years.

21. Dr. Vitagliano had no comprehension of the meaning of the term "custom and practice" in relation to the subject of preshipment treatment of chestnuts. No custom and practice about the use of a three day preshipment stagnant cold water bath has been established.

22. Dr. Vitagliano, respondent's expert, did not see the chestnuts concerned in this action; eight of libellants' witnesses (other than the shippers) who testified that the chestnuts were sound upon shipment are experienced chestnut surveyors, who actually saw the shipments. The experience of the shippers for periods up to fifty years in the preshipment treatment of chestnuts has demonstrated the reliability of their methods and that the treatments so given

by them were proper. The sound condition of the chestnuts long after the period fixed by respondent's expert, Dr. Vitagliano, within which mould would appear if not given proper preshipment treatment, establishes the adequacy of the shippers' method of treatment. All of the shipments were in proper condition for export to the United States upon delivery to respondent.

23. The extensive overall damage to both the common hold and refrigerated shipments, of all the shippers, whose businesses extend along the entire west coast of Italy from the Piedmont district through to the Salerno district, establishes that there was a basic underlying cause of damage common to all shipments; that the said basic cause was the lack of essential circulation of air throughout the stow due to respondent's failure to use dunnage.

### Conclusions of Law.

1. Libellants have the legal status alleged in the libel.

2. The shippers were at all times the owners of their respective shipments which were forwarded to the libellants at New York on a consignment basis.

3. Respondent was a common carrier and the owner of the S. S. Saturnia.

4. As the common hold shipments were in good condition on November 26, 1948, when the Saturnia returned to Naples, no question as to the sufficiency of the preshipment treatment given those shipments, or as to the character of stowage provided by respondent, is presented in determining the question of respondent's liability for their loss and damage.

5. Respondent's offer to discharge the Naples common hold cargo, contained in its letter to the Naples shippers was accepted by the latter but respondent failed to discharge its obligations thereunder, or under the agreement between Dr. Serafino, the shippers' counsel and Mr. Dresda, the respondent's agent. The failure to present proper bank guarantees had no relation to the respondent's refusal to discharge the common hold chestnuts, and this condition was waived by the respondent. The refusal to discharge was based, not on non-presentation of bank guarantees, but upon respondent's sailing plans which did not leave time to effect unloading.

6. Respondent's action in refusing to discharge the common hold chestnuts at Naples, upon the Saturnia's return to that port, as demanded by the shippers, was the proximate cause of the loss and damage suffered by that cargo.

7. Respondent is liable for the loss and damage to the common hold cargo upon the further ground that it was improperly stowed because of its failure to use dunnage.

8. The fact that damage to goods arises out of their inherent nature constitutes no defense to a carrier, under such an exception, where it appears that the damage would not have occurred but for the carrier's negligence. Respondent was charged, as a matter of law, with knowledge of the characteristics of the chestnuts and was obligated to give the cargo the kind of stowage its nature required.

9. The defense of inherent defect is not available to respondent because the chestnuts were in good condition when shipped and for the further reason that they were stowed in a negligent manner.

10. The shipments having been transported between Italian ports and the port of New York, the rights of the parties are governed by the U. S. Carriage of Goods by Sea Act, 46 U.S.Code Annotated, §§ 1300–1315.

11. The failure to supply and use proper dunnage in the stowage of the chestnuts made the S. S. Saturnia unseaworthy as to that cargo. Libellants' losses having resulted from unseaworthiness, the burden of proving the exercise of due diligence is on respondent, U. S. Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(1). Respondent's failure to use dunnage between the tiers of the cases and barrels constitutes failure to use due diligence in the stowage and care of libellants' cargo and renders respondent liable for the resulting damage, under the U. S. Carriage of Goods by Sea Act, 46 U.S.C.A. § 1303(1, 2).

292

12. Respondent having failed to prove the use of due diligence to make its vessel seaworthy with respect to the use of dunnage, and that failure being causally related to the damage to the chestnuts, respondent is not entitled to the benefit of the "strike" and other exemptions afforded under the U. S. Carriage of Goods by Sea Act, 46 U.S.C.A. § 1304(2). The defense of "strikes" is not available against the claims for loss and damage of the common hold cargo upon the further ground that the chestnuts were undamaged after the return of the Saturnia to Naples from New York; consequently, the additional length of time they were left on board the Saturnia on her return from New York to Naples because of the strike at the former port, resulted in no damage.

13. If some part of libellants' damage resulted from the inability of the Saturnia to discharge at New York on her first voyage because of the longshoremen's strike, the "strike" exception against liability is not available to respondent because its failure to use due diligence in stowing the chestnuts without dunnage, was a concurring fault.

14. An interlocutory decree may be submitted with the usual reference to a Special Commissioner.