834

OCEAN COMMERCIAL COMPANY, Inc.
and Henry D. McCord Corporation,
Libelants,

v.

The POLYKARP, her engines, etc., A/S
Kristiansands Tankrederi, Swedish
American Line and Swedish American
Line Agency, Inc., Respondents.

United States District Court
S. D. New York.
April 22, 1955.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, Proctors for Libelants (George B. Warburton and Harry D. Hunter, New York City, of counsel).

Haight, Deming, Gardner, Poor & Havens, New York City, Proctors for Respondents (Tallman Bissell, New York City, of counsel).

PALMIERI, District Judge.

This is an action in admiralty for cargo loss. The libelants seek to recover for the value of two shipments of potatoes delivered to respondent's vessel, Polykarp, at Halifax, Nova Scotia, in June 1949. The potatoes were discharged from the ship at Puerto Cabello, Venezuela, totally destroyed and in such condition that they were ordered condemned and dumped by Venezuelan Government health authorities. The factual controversy in the case revolves about three principal questions: (1) the condition of the potatoes at the time of delivery to the carrier; (2) the adequacy of stowage and ventilation provided by the carrier; and (3) the delay of the vessel en route at the port of La Guaira, Venezuela.

The Ocean Commercial shipment consisted of 1,300 bags of table stock potatoes grown and harvested in the Province of New Brunswick, Canada. They were sold to Ocean Commercial Company, Inc., one of the libelants, by F. W. Pirie Co., Ltd. of Grand Falls, New Brunswick. The McCord shipment consisted of 2,400 bags of table stock potatoes grown and harvested in Prince Edward Island, Canada, and were sold to libelant Henry D. McCord Corporation by Poole & Thompson Ltd. of Montague, Prince Edward Island.

Both shipments of potatoes were harvested in October 1948 and were kept in storage from the time of the harvest until the times of the respective sales, when

they were delivered out of warehouses into refrigerated rail cars and were thereafter transported to Halifax, the point of delivery to respondent's vessel.

The loading at Halifax took place on June 10th and 11th, 1949. The Polykarp sailed from Halifax on June 12th, 1949, and reached San Juan, Puerto Rico, her first port of call, eight days later, on June 20, 1949. She remained there four days, and required two additional days for the sailing between San Juan and La Guaira, arriving there on June 26, 1949. She remained at La Guaira, anchored offshore, for several days because of port congestion. She did not begin to discharge her cargo for that port until July 4th, interrupted it on July 5th because it was a national holiday, and completed it on July 6th. During the period of time the vessel was at La Guaira the temperature ranged from 90 to 100 degrees Fahrenheit. She sailed for Puerto Cabello the same day. On the next day, July 7, 1949, she arrived there and commenced discharge of the potato shipments in question. In all, approximately twenty-five days were consumed in the transportation of these shipments from Halifax to their destination at Puerto Cabello. The potatoes were there found to be in an advanced state of disintegration, causing many of the bags containing them to be rotten and torn. The potatoes were worthless and were ordered to be dumped by Venezuelan Government health authorities.

The potatoes in question were stowed in the lower hold and more will be said about this. It is extremely significant that a shipment of 198 bags of potatoes of the same variety, and harvested at the same time, but which were loaded in the 'tween deck of the Polykarp and carried on the same voyage but discharged at a later port of call, Curacao, outturned in good order and condition.

Before alluding to the manner of stowage and ventilation, which was a crucial issue in this case, I think it important to refer to the condition of the shipments at the time of their delivery to the respondents. Upon all the evidence adduced, I am satisfied that the potatoes of the shipments here involved were in good order and condition when delivered to the respondents for shipment on the Polykarp.

Captain Soderman, who served as supercargo aboard the Polykarp, testified to the effect that the potatoes, when received at Halifax, were in apparent good order and condition. This testimony has been substantiated by proof submitted since the trial. Mr. L. H. Poole, manager of Poole & Thompson, Ltd., sellers of the McCord shipment, testified to his extensive experience in the growing, storaging and marketing of Canadian potatoes, covering more than forty years. He had personal knowledge of the storage and shipping conditions at Prince Edward Island and the condition of the potatoes as they were sorted and rebagged during inspection by Canadian Government Inspector McDonald, since deceased. Mr. Poole testified that the potatoes were "fairly hard, and no sign of rot or disease or sprouting." Moreover, the Canadian Government inspection certificates sustained this testimony. These potatoes had been examined and passed by official inspection at the time they came into the storage warehouse. And again, when shipped out for export, they were inspected, graded and passed as required by the Canada Fruit, Vegetables and Honey Act.

The evidence relating to the shipment of the Ocean Commercial Company, Inc. was of a similar nature. Senator Pirie, President of the F. W. Pirie Co., Ltd. of Grand Falls, New Brunswick, sellers of the potatoes involved, could not remember the particular shipment but gave general testimony covering storage and rail shipment. He further testified that his company had exported sizeable quantities of potatoes to South America during June and July in the years prior to and subsequent to 1949 and that they have good keeping qualities when shipped in June and July, if given proper ventilation. In addition, two Government in-

spectors, Messrs. H. M. Wright and E. Dube, gave evidence of their favorable findings at the time of loading from the warehouse into rail cars on June 4th to 6th, 1949, just a few days before being loaded aboard the Polykarp. The original work sheets of Inspectors Wright and Dube, which had been on file in Ottawa since the time of the shipments, were made part of the record before me. They were produced by Mr. E. A. Eardley, Chief of the Fruit and Vegetable Inspection Service of the Department of Agriculture in Ottawa and they further substantiated the testimony concerning the good order and condition of the potatoes when shipped. The only evidence of a countervailing nature was offered by the respondent's expert witness, Dr. P. Pirone, a plant pathologist. He had no personal knowledge of the shipments in suit. In effect, he testified that Canadian potatoes shipped in June would be from the harvest of the previous fall, and, thus, be about nine months old; that they would be beyond their safe-keeping period which he fixed at six months. In answer to a hypothetical question which assumed optimum storage and shipment conditions and the good quality of the potatoes at the outset, and which also assumed tropical heat of 90 to 100 degrees Fahrenheit for a week, Dr. Pirone stated he would not expect serious deterioration but would expect some potatoes to disintegrate. As against the affirmative evidence offered by the libelants, I do not regard this expert testimony as sufficient to impugn the proof that the two shipments of potatoes here involved were in good order and condition upon delivery to respondent's vessel. Cf. The Niel Maersk, 2 Cir., 91 F. 2d 932, certiorari denied, 1937, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582; Warner Barnes & Co. v. Kokosai Kisen Kabushiki Kaisha, 2 Cir., 1939, 102 F.2d 450.

We come now to the crucial issue of stowage about which the principal factual dispute revolved at the trial. The two shipments in question were stowed in the lower hold. They totaled 3,700 bags of potatoes. There were about 20,000 additional bags loaded by the Polykarp. Because flour shipments from a Great Lakes port consigned to Puerto Cabello were already stored in the 'tween deck, only 198 bags of potatoes were loaded there; and they outturned in good condition, although discharged at Curacao, after the delay at La Guaira and the call at Puerto Cabello.

The Polykarp had two holds, one forward of the engine room space and one aft of this space. Each hold was divided into a 'tween deck and a lower hold. Each hold was served by two hatches. There were four hatches in all. The potatoes in question were stowed in the aft lower hold immediately under No. 3 Hatch and over a platform elevated some five inches from the floor of the hold. The stow extended upwards to about 1½ to 2 feet of the deck above. Dunnage was laid loosely in a criss-cross fashion every four or five tiers. A channel of one or two feet ran athwartship fore and aft of the shipments of potatoes. The bags were stowed from cargo battens to cargo battens and there was a space of from 6 to 10 inches between the cargo battens and the skin of the ship.

■■ Since potatoes are living, respiring organisms, the proper circulation of air through the potatoes was very important. Air was introduced into the lower hold by means of a flue or shaft at the after end of the No. 4 hold and a similar shaft at the forward end of the No. 3 hold. One suction ventilator and one blower led from the weather deck to the opening of the lower hold. There were, in addition, four shafts, about one foot square, in the corners of the hatch, which led from the platform beneath the stow through the 'tween deck to the weather deck. The circulation of air through these shafts, however, depended largely upon the movement of the vessel. They were ineffective to circulate air through the stow while the ship was at anchor. Under all of the circumstances presented here, it is my opinion that the shipments here in question required

the forced circulation of air throughout the period they were on board the Polykarp and that the provisions made to this end were inadequate. The inadequate circulation of air caused the potatoes to give off heat and moisture and to deteriorate. In my view, this inadequacy might have been obviated by stowage in the 'tween deck. Furthermore, in the light of the expert testimony adduced at the trial, I believe that stowage of these potato shipments in the lower hold was unwise and unsafe and contrary to proper stowage practice. See Schroeder Bros. v. The Saturnia, D.C.S.D.N.Y.1954, 123 F.Supp. 282, 286. The respondents have urged that since the Polykarp was carrying 23,667 bags of potatoes, there was not enough room on the vessel to give this large quantity 'tween deck stowage. I cannot regard this as a valid argument since the carrier was under no obligation to carry an amount of cargo which exceeded the carrier's capacity for adequate stowage and ventilation.

Although much has been said in this case about the delay of the Polykarp at the port of La Guaira. I cannot regard it as determinative of the issues here. It is my opinion that the lack of proper circulation of air through the potato bags, and the stowage in the lower hold, rather than 'tween deck stowage, were the proximate causes of the cargo loss for which recovery is sought. I do not regard the delay in La Guaira during excessively hot weather as being a determinative fact on this issue. Although the port congestion at La Guaira at the time was widely known and the parties here were aware of it, the question of respondent's legal responsibility, if any, for this delay, is not germane to the determination here because I believe the delay was not a causal factor. The potatoes carried in the 'tween deck outturned in good condition despite this delay—and despite the fact that they were not discharged until after libelants' potatoes were condemned, and then only at the Polykarp's later port of call. Moreover, there was evidence that Canadian potatoes harvested in October and shipped each year in size-able quantities during the months of June, July and August from Halifax to hot weather ports in the West Indies and South America outturned in good order and condition.

Libellants are entitled to a decree in accordance with this opinion.